## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

ST. PAUL FIRE AND MARINE INSURANCE     *
COMPANY

                                  *

              Plaintiff,           *

    v.                                *

TRANSAMERICA OCCIDENTAL LIFE
INSURANCE COMPANY, et al.         *       Civil Action No.:  WDQ-02-3123

                                  *

            Defendants.       *

       *      *      *      *      *      *      *      *      *      *

### ST. PAUL'S RESPONSE TO ORDER TO SHOW CAUSE

St. Paul Fire and Marine Insurance Company ("St. Paul"), Plaintiff, by its undersigned attorneys, hereby responds to the Court's Order to show cause dated April 10, 2003.

In its order dated April 10, 2003, this Court asked whether this case is ripe for adjudication.  The case not only is ripe for adjudication, under settled principles of law; it also is ripe for summary disposition, and accordingly St. Paul has already filed a motion for partial summary judgment.

### INTRODUCTION

This is an action by St. Paul to enforce unambiguous indemnity agreements with the Defendants.  St. Paul, as surety, agreed to furnish an appeal bond in a case in Georgia state court.  As a result of furnishing the appeal bond, St. Paul has paid a judgment in Georgia, in the amount of $7,527,513.91.

In consideration of St. Paul's agreement to furnish the appeal bond, the Defendants in this case -- who include some of the largest and most sophisticated insurance companies in the world -- agreed unconditionally, in writing, to indemnify St. Paul on demand for "any and all loss, damages, claims, costs, expenses and attorneys' fees which [St. Paul]

may incur by reason of [St. Paul] having furnished" the appeal bond.  (A copy of one of the Indemnity Agreements, which are identical, is attached for the Court's reference as ***Exhibit 1***).  To date, despite the fact that St. Paul has incurred nearly $8 million in "loss, damages, claims, costs, expenses and attorneys' fees" by reason of having furnished the appeal bond, none of the Defendants have paid St. Paul a penny in indemnity.

The Defendants are now seeking to delay their payment obligations.  They have filed a motion asking this Court to stay this case for an indefinite and open-ended period -- until appellate proceedings in the Georgia state court case have ended.  Unfortunately, that motion fails to draw the Court's attention to the relevant, controlling case law, in the Fourth Circuit and elsewhere, that establishes that the Georgia appellate proceedings have no relevance to either St. Paul's right to recover indemnity from the Defendants or the amount of St. Paul's recovery.

After reviewing Defendants' motion, this Court issued an order requiring St. Paul to show cause why the case should not be dismissed for lack of ripeness.  Under established law in this Circuit and elsewhere, this case is ripe, and it would be error for this Court to dismiss it, for the following reasons:

1.      The legal premise of Defendants' attempt to delay the adjudication of this action – that the Georgia appellate proceedings will somehow affect either St. Paul's right to recover or the amount of its recovery – is simply wrong, and is completely unsupported by the case law.  The Defendants in this case are not parties to the Georgia appeal and their Indemnity Agreements are neither in the record in that case nor are they involved in any way in that litigation.

Further, the overwhelming weight of authority establishes that when a surety enters into an indemnity agreement that entitles it to be indemnified against "all" losses it incurs "by reason of" issuing a surety bond, and then pays a claim against that bond in

good faith, the surety is entitled to recover the full amount it paid out on the claim. Under the case law this is the result even if the indemnitor argues that the claim is not valid; even if the indemnitor argues that the surety has overpaid; even if the claim has not been reduced to judgment; and even if all appeals are not pursued and exhausted.  *See*, *e.g., Fidelity and Deposit Co. of Maryland v. Bristol Steel and Iron Works*, 722 F.2d 1160 (4th Cir. 1983); *Commercial Ins. Co. of Newark v. Pacific-Penn Constr. Corp.*, 558 F.2d 948 (9th Cir. 1977); *Fireman's Fund Ins. Co. v. Nizdil*, 709 F. Supp. 975 (D. Or. 1975); *see* generally *infra*, pp. 12-22.

In this case St. Paul paid the Georgia judgment, "by reason of" issuing the bond, only after years of litigation and only after it faced both a judgment against it and a writ of execution.  Under established law it is entitled, <u>now</u>, to indemnity for "all" of its losses and expenses, including <u>every dollar</u> of the judgment it paid, without further delay.  As a matter of law, the Georgia appellate proceedings can have no impact upon St. Paul's right to full indemnity.

2.     Under settled federal law, a breach of contract case such as this one is ripe when the plaintiff has suffered actual, concrete injury, and all of the elements of a cause of action for breach of contract are present.  This case plainly meets those requirements for ripeness.  St. Paul has suffered actual injury, in an amount of millions of dollars, and all elements of a claim for breach of contract have occurred.

Moreover, St. Paul will be greatly and unfairly prejudiced if this case is dismissed.  It has sustained millions of dollars in unindemnified losses, and in all likelihood the limitations period is running against it.  The Georgia appellate proceedings are likely to grind on for several more years, at which time St. Paul may face insuperable limitations issues.  During the entire period St. Paul will be at risk that one or more of the indemnitors will become insolvent.  St. Paul bargained for and received a right to

immediate indemnity from the Defendants.  It would be unfair to subject St. Paul to the risks of limitations and insolvency when this case is ripe to be decided today.

## FACTS [1]

### I.  The Lawsuit Against Security Life.

In 1995, Gordon and Clarice Clark ("the Clarks") sued Security Life Insurance Company of America ("Security") in the Georgia state court located in Early County, Georgia.  After a trial, the jury found in the Clarks' favor on their claims for fraud and violation of RICO.  On August 6, 1996, the trial court entered judgment on the RICO count only in the amount of $14,476,694.18 in favor of the Clarks against Security.

### II.  Defendants' Execution of Indemnity Agreements and St. Paul's Issuance of an Appeal Bond in Consideration of Those Agreements.

Security wished to appeal the judgment, but under Georgia law it needed to post an appeal bond of $16,220,000 ("the Appeal Bond") to avoid execution on the judgment while the appeal was pending.  It asked St. Paul to issue the Appeal Bond.

Before agreeing to furnish the Bond, St. Paul demanded and received substantial collateral and indemnity obligations from both Security and the Defendants in this case.  Specifically, Security entered into an Agreement of Indemnity with St. Paul, and posted a letter of credit in favor of St. Paul in the amount of $2,433,000.  The amount of the letter of credit was 15% of the amount of the required Appeal Bond.

St. Paul required additional assurance that it would be fully indemnified with regard to the remaining 85% of the amount required for the Appeal Bond.  Defendants, who were then Security's reinsurers, agreed to provide such assurance.  In or about November 1996, Defendants (together with Allianz, a reinsurer that is not a party to this

---

[1] The documents and affidavits supporting the facts set forth in this Response are attached to St. Paul's pending motion for partial summary judgment.

action) entered into separate identical indemnity agreements with St. Paul. Pursuant to those agreements, Defendants and Allianz severally agreed to indemnify St. Paul, in specific percentages totaling 85% of the potential losses to which St. Paul was exposed as a result of issuing the Appeal Bond. Each indemnity agreement also contained a maximum dollar amount that the particular Defendant who executed the Agreement would be required to pay.

Each Indemnity Agreement provided, unconditionally and unequivocally, that each Defendant would, *inter alia,*

> indemnify [St. Paul] and hold [St. Paul] harmless in respect of [Defendant's] respective proportion[] of any and all loss, damages, claims, costs, expenses and attorney's fees which [St. Paul] may incur by reason of [St. Paul] having furnished the [Appeal Bond] and [Defendant] further agree[s] that [Defendant] shall immediately pay [St. Paul], upon [St. Paul's] demand, the amount of any claim that [St. Paul] may receive under and by reason of [St. Paul's] having issued the [Appeal Bond]. …

St. Paul's requirement that the Defendants execute the Indemnity Agreements is consistent with standard practice in the surety industry. It is well recognized that surety bonds such as the Appeal Bond in this case involve essentially an extension of credit by the surety. *State Highway Admin. v. Transamerica Ins. Co.*, 278 Md. 690, 367 A.2d 509, 514 n.6 (1976), citing E.A. Cushman, *Surety Bonds on Public and Private Construction Projects*, 46 A.B.A. J. 649, 652 (1960). The surety's interest is protected by indemnification agreements with the principal and other parties; these agreements expressly protect the surety's extension of credit on behalf of the principal. *See* Armen Shahinian, *The General Agreement of Indemnity, in The Law of Suretyship*, 487 (Edward G. Gallagher ed., 2000). It is common for sureties to obtain indemnity agreements from parties other than the entity on whose behalf the bond was issued. *Id.* at 487 ("A condition uniformly imposed by the surety is that its principal and usually the individuals

who control it execute an agreement of indemnity to augment the surety's common law rights").

In consideration of the Indemnity Agreements, on or about December 2, 1996, St. Paul, as surety, and Security, as principal, filed the Appeal Bond in the amount of $16,220.000.00.

### III.  Security's First Set of Appeals.

The appellate proceedings that followed have been complex and protracted.  In the initial appellate decision, the Georgia Court of Appeals held that the trial court had erred in submitting the RICO claim to the jury.  *Security Life Ins. Co. v. Clark*, 229 Ga. App. 593, 494 S.E.2d. 388 (Ct. App. 1997).  The Court of Appeals' decision did not address the Clarks' fraud claim against Security.

The Supreme Court of Georgia granted certiorari, and on October 26, 1998, it affirmed the Court of Appeals' decision in part and reversed it in part.  It held that the Court of Appeals had properly analyzed the scope of the RICO statute, but reversed the Court of Appeals' decision on the grounds that (1) it had improperly taken judicial notice of particular facts, and (2) it had improperly analyzed Security's vicarious liability for the acts of its agent.  *Clark v. Security Life Ins. Co. of America*, 270 Ga. 165, 509 S.E.2d. 602 (1998).

On remand, on July 30, 1999, the Georgia Court of Appeals issued a decision remanding the case to the trial court for proceedings consistent with the judgment of the Georgia Supreme Court and with the portions of the judgment of the Court of Appeals that had not been reversed.  *See Security Life Ins. Co. v. Clark*, 239 Ga. App. 690, 521 S.E.2d. 434 (Ct. App. 1999).

The case did not immediately return to the trial court.  Rather, Security filed a petition for certiorari.  Once again, the Supreme Court of Georgia granted certiorari, and

on September 11, 2000, more than four years after the original trial court verdict was entered, it rendered another opinion in the case. This time, the Supreme Court reversed the 1999 opinion of the Court of Appeals, and remanded the matter once again to the Court of Appeals for action consistent with the Supreme Court opinions. *Security Life Ins. Co. of America v. Clark*, 273 Ga. 44, 535 S.E.2d. 234 (2000).

In early 2001, the Georgia Court of Appeals issued another opinion in this case. This time, it remanded the case to the trial court for proceedings in accordance with the prior appellate decisions. *Security Life Ins. Co. v. Clark*, 249 Ga. App. 18, 547 S.E.2d. 691 (Ct. App. 2001).

## IV. The Court Denies St. Paul's Motion to be Discharged as Surety and Enters Judgment Against St. Paul, and St. Paul Unsuccessfully Appeals.

On remand to the trial court in 2001, the parties filed papers expressing their views of how the trial court should proceed. In addition, St. Paul filed a motion seeking the discharge of St. Paul as surety. In substance, St. Paul contended that the original trial judgment had been reversed and that therefore, under the terms of the Appeal Bond, it had been discharged of its obligations as surety.

In response to the parties' filings, the trial court, on July 5, 2001, entered a "Modified Final Judgment on Remand from the Court of Appeals." In that Modified Judgment it entered judgment against Security on the jury's original fraud verdict. It denied St. Paul's motion for discharge, and entered judgment against St. Paul on the Appeal Bond.

St. Paul appealed. Security also appealed, challenging the trial court's entry of the fraud judgment. The Court of Appeals affirmed the trial court's decisions to enter judgment against Security on the fraud verdict, to deny St. Paul's motion for discharge,

and to enter judgment against St. Paul on the Bond.  *St. Paul Fire & Marine Ins. Co. v. Clark*, 255 Ga. App. 14, 566 S.E.2d. 2, 13 (Ct. App. 2002).

St. Paul thereafter filed a Petition for Certiorari to the Georgia Supreme Court, which was denied on September 6, 2002.

## V.    The Plaintiffs Obtain a Writ of Execution Against St. Paul, and St. Paul Pays the Judgment.

On remand, on November 11, 2002, the trial court ordered a new trial on the issue of attorneys' fees and punitive damages, and entered judgment in favor of the Clarks, and against St. Paul and Security, in the amount of $7,481,950.53.  This judgment included $4,073,000.00 in judgment principal, plus interest.  The court also awarded the Clarks additional interest of $1,339.07 per day on the judgment principal until the judgment was paid.

On November 13, 2002, the Clarks obtained a writ of fieri facias – that is, a writ of execution -- against Security and St. Paul for the full amount of the judgment.  Thereafter, pursuant to its obligation under the Appeal Bond, St. Paul paid the Clarks' judgment and the interest thereon, totaling $7,527,513.91.

## VI.    The Third Set of Appeals.

Even though St. Paul had paid the judgment, Security continued to pursue yet another appeal, in which it challenged the trial court's calculation of the interest to be awarded to the Plaintiffs.  St. Paul was not a party to the appeal.  The Clarks moved to dismiss the appeal, on the ground that St. Paul's payment of the judgment rendered the appeal moot.  In the alternative, the Clarks sought to have St. Paul substituted for them as appellee, on the ground that any right to enforce the judgment now resided in St. Paul.

The Court of Appeals denied the Clarks' motion to dismiss the appeal as moot, but granted the Clarks' request that St. Paul be substituted as an appellee, without notice to St. Paul or an opportunity for a hearing.

St. Paul immediately filed a motion for reconsideration. It also moved to dismiss the appeal. The fundamental basis for St. Paul's motion for reconsideration was that (a) it had not been afforded notice or hearing before being joined as a party to the appeal, in violation of Georgia statute; and (b) under the circumstances of the case, it had no interest in the outcome of the appeal and therefore was not a proper party.

The Court of Appeals denied both forms of relief sought by St. Paul. The Court of Appeals did not explain the basis of its decisions, which St. Paul believes are contrary to Georgia law. St. Paul then filed a petition for certiorari to the Georgia Supreme Court. That petition is pending.

## VII.  St. Paul's Efforts to Enforce the Indemnity Agreements.

Since it furnished the Appeal Bond, St. Paul has communicated with the Defendants on multiple occasions, orally and in writing, to obtain the promised indemnity. Those efforts have not been successful.

As a result, St. Paul has filed this suit to recover the losses it has suffered by reason of issuing the appeal bond. The First Amended Complaint contains two counts. Count I is a request for a declaratory judgment, seeking a declaration by this Court that St. Paul is entitled to indemnity from each of the Defendants, up to and including the full amount of that Defendant's proportionate share of all losses, damages, claims, costs, expenses, and attorneys' fees that St. Paul has incurred by reason of having furnished the appeal bond. Count II -- the count on which St. Paul has already moved for partial summary judgment -- is a claim for breach of contract. In Count II St. Paul seeks

damages arising from the Defendants' failure to indemnify it against the amounts already expended by St. Paul by reason of having issued the Appeal Bond.

## ARGUMENT

**I.      Under The Decisions of the Fourth Circuit and Other Courts, The Outcome of Security's Pending Appeal in Georgia Cannot Affect the Existence of St. Paul's Contractual Right to Indemnification or the Amount Thereof, and Therefore It Would Be Error to Dismiss This Case for Lack of Ripeness.**

This Court's inquiry as to whether this case is ripe arises from a factually and legally baseless argument made in Defendants' Motion for a Stay of Proceedings: that the outcome of Security's pending appeal in Georgia will affect the amount St. Paul can recover in this case. Case law decided by the Fourth Circuit, and virtually every other Court to have considered the issue, unconditionally rejects that argument. *See* pp. 12-22, *infra*.[2] The outcome of Security's Georgia appeal cannot and will not affect St. Paul's entitlement to obtain indemnification or the amount thereof. On the contrary, the outcome of that appeal is irrelevant to this case. *See*, *e.g.*, *International Fid. Ins. Co. v. Spadafina*, 192 A.D.2d 637, 596 N.Y.S.2d 453, 454 (App. Div. 1993) (in enforcing surety's contractual right to indemnity, it was "irrelevant" whether principal was liable on underlying debt). Accordingly, the existence of Security's appeal does not render this case unripe.

The factual background of this case is straightforward. The Defendants promised unambiguously, in writing, that they would indemnify St. Paul against "any and all loss,

---

[2] There is no choice of law issue in this case because, as will be demonstrated herein, the relevant case law is virtually uniform from jurisdiction to jurisdiction. To the extent that choice of law matters, St. Paul submits that the relevant law is the law of North Carolina, New York or New Jersey. The Indemnity Agreements were sent from Defendants' counsel's offices (in New York) to St. Paul's office in New Jersey, except for Defendant Transamerica's which was sent from North Carolina. Under Maryland choice of law principles, this dictates that the law of New York, New Jersey, or North Carolina governs this case. *See Ericksson v. Cartan Travel Bureau*, 109 F. Supp. 315, 317 (D. Md. 1953) (concluding that, under Maryland choice of law rule, contract between Maryland travelers and Illinois travel agency was effective in Illinois where agency, after confirming reservations and receiving travelers' payment mailed from Baltimore to Chicago, sent coupon books from Chicago to Baltimore); *Sun Ins. Office, Ltd., of London v. Mallick*, 160 Md. 71, 153 A. 35, 40 (1931) (stating that where insurance policy was executed by insurer in New York, but delivered in Maryland through insurer's Maryland broker to the insured, it was a Maryland contract).

damages, claims, costs, expenses and attorneys fees" that St. Paul incurred "by reason

of … having furnished" the Appeal Bond.[3/]

There is no question that St. Paul has incurred "loss, damages, claims, costs,

expenses and attorneys' fees" by reason of having furnished the Appeal Bond, including

the payment of judgment entered against it, in its capacity as surety, by the Georgia trial

court.  St. Paul would not have been exposed to that judgment except for having

furnished the Appeal Bond:  before it issued the Appeal Bond at the request of Security

Life, St. Paul was not a party to the Georgia case and had no involvement in the case.

Because these undisputed facts establish all elements of its claim, St. Paul has moved for

partial summary judgment.

Seeking to delay their payment obligations, several of the Defendants have filed a

"Motion For a Stay of Proceedings" in which they argue that the outcome of Security's

appeal in the Georgia courts might somehow affect the outcome in this case.  Defendants

contend, incorrectly, that, "[r]eversal of any portion of the [Georgia state court judgment

against Security] will reduce the potential obligation that defendants may have to St. Paul

under the indemnity agreements" (Defendants' Memorandum at 7), and that St. Paul may

---

[3/] It is well established that where the terms of an indemnity agreement are unambiguous, the court should enforce the terms of the agreement consistent with their plain meaning. *See, e.g.*, *Wald v. Marine Midland Bus. Loans, Inc.*, 270 A.D.2d 73, 704 N.Y.S.2d 564, 566 (App. Div. 2000) (holding that interpretation of unambiguous indemnity agreement was question of law for the court); *Andre Constr. Assoc.'s, Inc. v. Catel, Inc.*, 293 N.J. Super. 452, 681 A.2d 121, 123 (Super. Ct. Law Div. 1996) (stating that where indemnity agreement clearly and unambiguously sets forth parties' obligations, it should be summarily enforced) (citations omitted); *Kirkpatrick and Assoc. v. Wickes Corp.*, 53 N.C. App. 306, 280 S.E.2d. 632, 634 (Ct. App. 1981) (where indemnity contract language is clear and unambiguous, court must interpret contract as written) (citations omitted); *United States Fid. and Guar. Co. v. Green*, 64 Misc.2d 1, 314 N.Y.S.2d 426, 430 (Sup. Ct. 1969) (stating that where intention of parties can be derived from the unambiguous language of the indemnity agreement, a trial is not necessary to determine its legal effect) (citations omitted).  *See also, e.g., Nobel Ins. Co. v. Hudson Iron Works, Inc.*, 51 F. Supp. 2d 408, 414 (S.D.N.Y. 1999) (granting partial summary judgment in favor of surety as to co-surety's liability to surety under terms of unambiguous indemnity agreement and co-surety agreement); *Hartford Fire Ins. Co. v. Cheever Dev. Corp.*, 289 A.D.2d 292, 734 N.Y.S.2d 598, 600 (App. Div. 2001) (holding that surety was entitled as a matter of law to recover attorneys' fees from principal under unambiguous terms of indemnity agreement) (citations omitted).  Those decisions are in accord with the general principles underlying Maryland contract law.  *General Motors Accep. Corp. v. Daniels*, 303 Md. 254, 492 A.2d 1306, 1310 (1985).

have "overpaid" when it "volunteered" to pay a "questionable judgment." (Defendants'
Memorandum at 6).

Unfortunately and improperly, Defendants made this argument without drawing
the Court's attention to the relevant case law from the Fourth Circuit and other
jurisdictions. They did not cite any law in support of the argument at all. The controlling
case law, set forth below, demonstrates that under the clear language of the Indemnity
Agreements executed by the Defendants, St. Paul is entitled to full indemnity for the
amounts it has paid, regardless of the outcome of Security's appeal in Georgia. In fact,
Defendants have not cited, and St. Paul has not discovered, a single case that would
support the argument that the outcome of Security's pending Georgia appeal will affect
the amount that St. Paul can recover in this case.

The following discussion reflects just a small sample of the many cases that have
rejected arguments that are indistinguishable from those being made by the Defendants.

In *Fidelity and Deposit Co. of Maryland v. Bristol Steel and Iron Works*, 722 F.
2d 1160 (4th Cir. 1983), Bristol had entered into a written indemnity agreement with its
sureties to induce them to execute a surety bond on Bristol's behalf. *Id*. at 1161. After
the sureties issued the bond, the obligee of the bond, the Pennsylvania Department of
Transportation ("PENNDOT"), made a substantial claim against Bristol. Bristol refused
to pay the claim, and PENNDOT then made demand on the sureties. After resisting
PENNDOT's demand for several years, the sureties eventually agreed to pay the claim --
even though that claim had never been reduced to judgment, against either Bristol or the
sureties themselves.

Bristol, attempting to evade its indemnification responsibilities to the sureties
under its written indemnity agreement, made an argument that is indistinguishable from
Defendants' argument here. It argued that:

> a surety is under no duty to pay an obligation of its principal when the
> principal's liability has not been established or admitted and that, if it
> makes a payment prior to that determination of its principal's liability, it
> does so at the risk of "being able to prove the facts which might have
> rendered [its principal] liable … as well as the reasonableness of the
> amount which it paid."

*Id.* at 1163.  In other words, Bristol contended that the sureties should not have paid until

liability had been "established or admitted."

The Fourth Circuit forcefully rejected that argument.  It held that where there is

an express indemnity agreement between the surety and indemnitors, the surety is entitled

to obtain indemnity from the indemnitors in accordance with "the letter of the

agreement."  *Id.*  The Court acknowledged that at common law, a surety had a right to

indemnification only when it paid a debt for which its principal was actually liable, <u>but

this doctrine did not apply where there was a written indemnification agreement</u>.  *Id.*

(emphasis added).  The Fourth Circuit further held under the indemnity agreement that

was before it, the sureties could recover complete indemnity from Bristol, despite the fact

that PENNDOT's claim had been neither reduced to judgment nor appealed.  The only

payments that the sureties might not be able to recover from the indemnitor were those

made through "fraud or lack of good faith."  *Id.*  Because in that case (as in this one)

there was no fraud or bad faith on the part of the sureties, the Fourth Circuit upheld the

grant of summary judgment against the indemnitor in the full amount of the indemnity

they sought.[4]

In *Commercial Insurance Co. of Newark v. Pacific-Peru Construction Corp.*, 558

F.2d 948 (9th Cir. 1977), Pacific-Peru entered into a contract to build a public housing

---

[4] In reaching its decision, the Fourth Circuit relied on *United States Fidelity Co. v. Sandoval*, 223 U.S. 227 (1912), an appeal bond case in which the indemnitors attempted to evade their duty of indemnification by arguing that the surety could not recover until all appeals had been exhausted.  The Supreme Court rejected that argument and enforced the surety's right to be indemnified even absent exhaustion of all appeals.  It specifically held that the surety was not required to wait for a writ of execution before paying the judgment.

project in Peru.  Pacific-Peru's surety required both Pacific-Peru and its parent company to sign an indemnity agreement containing language very similar to the Indemnity Agreements in this case.  The agreement required the indemnitors to indemnify the surety against "all liability, losses, costs, damages, attorneys' … fees, … and expenses of whatever kind or nature which the Surety may sustain or incur <u>by reason or in consequence of having executed … such bond.</u> …"  *Id.* at 953 (emphasis added).

A dispute arose between Pacific-Peru and the owner of the project.  The dispute resulted in a substantial judgment being entered in Peru in favor of the owner and against Pacific-Peru.  Pacific-Peru refused to pay the award.  The owner then made a claim against the surety bond, which resulted in an order by a Peruvian judge ordering the surety to pay the award promptly.  The surety complied with the Peruvian judge's order and then sought indemnity from Pacific-Peru and its parent company.

Pacific-Peru raised a host of objections to the enforceability of the Peruvian judgment, similar to the arguments made by the Defendants in this case.  Pacific-Peru argued that the Peruvian judgment was invalid; that the Peruvian judgment was not final because the surety failed to exhaust its appeal rights; that the Peruvian judgment violated United States public policy; and that the Peruvian trial was unfair.  *Id*. at 951.  Therefore, Pacific-Peru argued, the surety had suffered no actual liability; the surety had been a "volunteer" when it paid the judgment; and the surety was not entitled to indemnification. *Id*.

The Ninth Circuit flatly rejected all of Pacific-Peru's argument.  It held that it did not need to look into the validity of the Peruvian judgments, because <u>even if those judgments were flawed, "that fact does not provide a defense to [the surety's]  right of indemnification.</u>"  *Id.* at 952 (emphasis added).  The Court held that the surety's indemnification rights turn not on the validity of the judgments, but rather on the

language of its indemnity agreement. *Id.* The Court went on to state, in language that fits this case precisely:

> The language of the indemnification agreement plainly embraces the payment, which was actually made to discharge the obligation incurred under the Peruvian judgments. Appellants' arguments based on the validity of the Peruvian judgments miss the mark. To be sure, equity generally implies a right to indemnification in favor of a surety only when the surety pays off a debt for which his principal is liable … . However, resort to implied indemnity principles is improper when an express indemnification contract exists. "There can be no question but that a surety is entitled to stand upon the letter of his contract, and his undertaking is to be construed strictly in his favor and is not to be extended by implication or inference beyond the bare scope of its terms." [citations omitted]. … Clause 2 of the indemnity agreement quoted above does not limit Pacific-Peru's liability for indemnification to losses incurred by [the surety] based upon a foreign judgment enforceable in the United States. The broad terms of the clause provide indemnification for any loss suffered by [the surety] by "<u>reason … of having executed</u>" the performance bond … . Post judgment regret about the bargain that was made is no foundation for relieving the appellants of the obligations they freely assumed under the contracts they executed.

*Id.* at 953 (emphasis added) (citations omitted). In short, the Court held that under the language of the indemnity agreement, which required Pacific-Peru to indemnify the surety for all losses it incurred "by reason of" the issuance of the bond, the alleged flaws in the judgment -- including the surety's decision not to exhaust all appeals -- were irrelevant to the surety's right of recovery and to the amount it could recover.

In *Old Republic Surety Co. v. Reliable Housing, Inc.*, 2002 WL 31687287, 572 S.E.2d. 442 (N.C. Ct. App. Dec 3, 2002), Reliable obtained a "mobile home dealer bond," a type of surety bond, from its surety. *Id*. at *1. As an inducement for the surety to issue the bond, Pearman, an individual officer of Reliable, signed an indemnity agreement in favor of the surety that obligated him personally. That agreement contained language very similar to the Indemnity Agreements in this case. The indemnitor promised:

> to indemnify [the surety] and hold it harmless against all loss, liability, costs, claim damages, and expense, internal or external of whatever kind and nature including but not limited to investigative, accounting, engineering, the fee and disbursement of counsel whether on salary, retainer, or otherwise which [the surety] may sustain or incur for or <u>by reason of said Company writing said bond</u>.

*Id.* (emphasis added). Two claims were made against the bond, and the surety paid them and then sought to enforce its indemnity rights against the indemnitor.

The indemnitor attempted to evade his contractual indemnity responsibilities by arguing that the surety would only be entitled to indemnification if the claims were "properly" paid to the claimants. *Id*. at *2. The Court disagreed. Instead, it enforced the unambiguous terms of the indemnity agreement. It observed that "[u]nder the contract, [the indemnitor] agreed to hold Surety harmless for expenses related to payments made under the bond. Surety is therefore entitled to recover from [the indemnitor] *all* expenses incurred as a result of paying claims made against Reliable Housing." *Id*. (emphasis in original). Thus, under the indemnity agreement, the individual indemnitor was required to indemnify the surety despite the facts that (1) the claims against the mobile home dealer had not been prosecuted to judgment, (2) the indemnitor challenged the propriety of surety's payment of the claims.

In *American States Insurance Co. v. Glover*, 1992 WL 78786, 960 F.2d 149 (6th Cir. April 16, 1992), the Glovers had obtained both construction-related bonds for their constructing companies, and appeal bonds, from their surety. *Id.* at *1-2. In consideration of obtaining the bonds, they were required to sign an indemnity agreement that required them personally to indemnify the surety against all losses and expenses that the surety sustained "[b]y reason of having executed or procured the execution of the Bonds," *id*. at *1 -- once again, the same basic language involved in this case. After the surety had to make payments on both the appeal bond and construction bonds, it sued the

Glovers for indemnification.  The Glovers defended on the ground that the surety had a duty to mitigate its losses under the indemnity agreement, and that it had failed to do so.

The Sixth Circuit firmly rejected that defense.  It held that under Kentucky law, failure to mitigate is not a defense to an indemnity action; rather, the indemnitors were required to pay, in accordance with the language of the indemnity agreements, all losses incurred by the surety by reason of issuing the bonds.  Under the terms of the indemnity agreements, the Glovers could successfully attack the payments made by the surety only by pleading and proving fraud or lack of good faith.  *Id*. at *4-5.  Because there was neither bad faith nor fraud on the part of the surety, the Sixth Circuit upheld the trial court's decision to grant a directed verdict to the surety.

In *Fireman's Fund Insurance Co. v. Nizdil*, 709 F. Supp. 975 (D. Or. 1989), a case in which Defendant Transamerica was one of the plaintiff sureties, Nizdil had agreed in writing to indemnify the sureties in consideration of the sureties' agreement to issue certain bonds.  The sureties, including Transamerica, incurred more than $100,000 in losses as a result of issuing the bonds, but Nizdil refused to indemnify them.  When the sureties sued to enforce the indemnification agreements, Nizdil argued that the sureties had overpaid the claims against the bond and that he was entitled to a jury trial on how much the damages should have been.  *Id*. at 76.

The Oregon District Court rejected that argument.  It held that "[t]he written Indemnity Agreement signed by defendant supersedes any common law right to indemnity" and that "[a]ny claim asserted against the surety, <u>regardless if it is valid or outside the scope of the bond</u> triggers the obligation to indemnify the surety."  *Id*. at 976-977 (emphasis added).  In other words, the sureties had the right to be indemnified completely for what they had paid, even if the claim was not valid.

In *United States Fidelity and Guaranty Co. v. Feibus*, 15 F. Supp. 2d 579 (M.D. Pa. 1998), the indemnitors had executed indemnity agreements that obligated them to indemnify a surety that had issued bonds on behalf of various construction companies. *Id.* at 583. When the contractors defaulted and claims were made against the bonds, the indemnitors attempted to avoid liability under these written indemnity agreements. The District Court described the indemnitors' argument as follows:

> Defendants argue that the terms of the *bonds* are controlling, and not the language of the [indemnity agreement]. Defendants contend that plaintiff breached the bonds by making payments it was not obligated to make and therefore any money paid by Plaintiff was as a "volunteer … ." Under this argument, there would have to be *actual liability* under the bonds before plaintiff could make any payments to an obligee.

*Id.* (emphasis in original).

The District Court rejected the indemnitor's argument. It noted that the parties signed an express indemnity agreement that did not provide that the surety would be entitled to indemnity only if there was actual liability under the bonds. *Id.* Rather, it enforced the language of the indemnity agreement, which required indemnification of the surety for "any and all liabilities, losses and expenses of whatsoever kind or nature … imposed upon, sustained, or incurred by [the surety] <u>by reason of</u> … having executed, provided or procured bonds …" *Id.* at 584 (emphasis added).

There are many cases in addition to the ones described above that illustrate the same principles. *See*, *e.g.*, *Frontier Ins. Co. v. International, Inc.*, 124 F. Supp. 2d 1211 (N.D. Ala. 2000) (under indemnity agreement, surety was entitled to recover against indemnitor despite the fact that indemnitor claimed that surety had overpaid); *General Accident Ins. Co. of America v. Merritt Meridian Constr. Corp.*, 975 F. Supp. 511 (S.D.N.Y. 1997) (surety was entitled to recover against indemnitor under indemnity agreement, even though indemnitor argued that surety's liability on the underlying bond

had not been finally established); *Employers of Wausau v. Abel Green, Inc.*, 749 F. Supp. 1100, 1103 (S.D. Fla. 1990) (surety is entitled to reimbursement for payments made in good faith, regardless of whether liability actually existed).

These cases, based on undisputed legal principles, establish why the outcome of the Georgia appellate proceedings is irrelevant to St. Paul's right to recover from the Defendants, <u>and</u> to the amount of that recovery. The courts routinely enforce indemnity agreements requiring the indemnification of sureties for all losses and expenses sustained "by reason of" issuing surety bonds, precisely in accordance with their terms. Sureties are not required to wait to pay claims on bonds until judgment has been entered against them. As *Bristol Steel*, *Pacific-Peru*, and *Sandoval* show, sureties are not required to exhaust all litigation and appellate remedies, or wait till the end of appellate proceedings, to be entitled to indemnification from their indemnitors for the payments they have made "by reason of" having issued bonds. In fact, sureties are not even required to wait until the claims against the bond have been definitely established in court to be entitled to indemnity. Although indemnitors frequently have tried to avoid their written indemnification obligations by claiming that a surety "overpaid" or paid as a "volunteer," these arguments are not a defense if the indemnitors have agreed to indemnify the surety for all of its losses and expenses incurred "by reason of" having furnished a bond.

These virtually universal principles, applied to this case, demonstrate that the outcome of Security's Georgia appeal is irrelevant to this case. Rather, the case is ripe for summary judgment. St. Paul entered into Indemnification Agreements with the Defendants requiring them to indemnify St. Paul against all losses and expenses it incurred "by reason of" issuing the Appeal Bond. In consideration of these Indemnity Agreements, it issued the Appeal Bond. As a direct result of issuing the Appeal Bond, after years of litigation, St. Paul had judgment entered against it, as well as a writ of

execution.  At this point, St. Paul paid off the judgment that had been entered against it, in an amount exceeding $7.5 million.  St. Paul resisted the claims in good faith until it faced judgment and execution, which is more than the case law requires.

As the cases set forth above establish, St. Paul's payment of the judgment, together with attorneys' fees and expenses, establish the amount that St. Paul is entitled to recover.  The Defendants' argument that St. Paul could or should have paid less, depending on the outcome of Security's Georgia appeal, and that as to any excess it was a "volunteer," simply has no legal relevance.  The express written Indemnity Agreements require the Defendants to indemnify St. Paul against "all" loss and expense it incurred "by reason of" issuing the Appeal Bond.

The Defendants in their Motion for Stay of Proceedings identified no case law that supports their argument that St. Paul's damage entitlement could be affected by the outcome of the Georgia case.  They identified no legal authority that would justify a departure from the plain language of the Indemnity Agreements they signed.  They pointed to no law that would permit them to evade their payment obligations to St. Paul on the basis of the assertion that St. Paul was a "volunteer" or that it was required to pursue further appeals in Georgia.  On the contrary, as the Fourth Circuit held in *Bristol Steel*, the common law "volunteer" defense has no application to cases like this one in which there are written Indemnity Agreements.  *Bristol Steel*, 722 F.2d at 1163.

Because they can find no support in the language of the Indemnity Agreements or in the case law, Defendants in their motion to stay mischaracterized a decision of the Georgia Court of Appeals.  Defendants argue that "the Georgia Court of Appeals has concluded that the right of St. Paul to obtain indemnity from its indemnitors on the supersedeas bond is conditioned upon a finding that the amount paid by St. Paul was actually due and payable."  *See* Defendants' Memorandum at 7.

That argument is a gross mischaracterization of the decision in the Georgia Court of Appeals. There is not one word in that opinion that addresses St. Paul's right to enforce its contractual indemnity rights against the Defendants. The Defendants in this case are not even parties to the Georgia appeal; the only parties are St. Paul and Security. The nature and extent of St. Paul's contractual indemnity rights against the Defendants are not and have never been before the Georgia courts. The Indemnity Agreements on which St. Paul's claims in this case are based are not in the record in that proceeding. No court in Georgia or anywhere else has addressed or interpreted the Indemnity Agreements between St. Paul and the Defendants.

In short, nothing that can possibly happen in Security's Georgia appeal can change St. Paul's entitlement to be indemnified by the Defendants, or the amount they owe as a result of St. Paul's payment of the judgment against it and Security. Therefore, the pendency of Security's Georgia appeal has no impact on the ripeness of this case.

## II. Under Settled Principles of Federal Law This Breach of Contract Action is Ripe for Adjudication, and St. Paul Would be Unfairly Prejudiced by its Dismissal.

A case is "ripe" when a "dispute has matured to a point that warrants decision because an actual, concrete injury has occurred." *Washlefske v. Winston*, 234 F.3d 179, 186 (4th Cir. 2000) (Widener, J, concurring), citing 13A Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d*, §3532, at p. 112 (Supp. 2000). Under this doctrine, St. Paul's breach of contract claim against the Defendants plainly is ripe. St. Paul plainly has suffered an "actual, concrete injury" – it has paid nearly $8 million, but Defendants have refused to indemnify it for any portion of that sum. As the cases cited above establish, the pending Georgia appeal is irrelevant to determining the existence or the amount of St. Paul's injury, but if it were relevant, at most it would affect the measure of damages.

Further, the cases that have addressed whether a claim for breach of contract is ripe squarely support the ripeness of this case.  In *Daines v. Alcatel*, 105 F. Supp. 2d 1153 (E.D. Wa. 2000), for example, the District Court considered a challenge to the ripeness of a breach of contract action.  It held that the case was ripe because the complaint alleged the existence of a contract and breach of that contract.  *See also Asad v. Hartford Life Ins. Co.*, 116 F. Supp. 2d 960 (N.D. Ill. 2000) (breach of contract action found ripe when based on anticipatory repudiation; plaintiff did not have to wait until out-of-pocket payments were actually made given party's unequivocal breach).

In this case, St. Paul has demonstrated 1) an express written contract between itself and defendants; 2) performance of this contract by St. Paul; 3) defendants' breach of the contract through failure to indemnify St. Paul; and 4) damages to St. Paul. [5/]  All of the elements of a breach of contract action are present, and thus the action is ripe for adjudication.

Consistent with these cases, the case law in the Fourth Circuit indicates that a case generally is ripe at the time the statute of limitations begins to run.  In *Franks v. Ross*, 313 F.3d. 184, 194 (4th Cir. 2002), the Fourth Circuit recognized this correlation between ripeness and the beginning of the limitations period.  The court stated that "a cause of action accrues for purposes of the statute of limitations 'when it is sufficiently ripe that one can maintain suit on it.'"  *Id.* (*quoting Whittle v. Local 641, Int'l Bhd. of Teamsters*,

---

[5/] These are all of the elements of a breach of contract claim under applicable law.  See, e.g., *Minuteman Press Int'l. v. Matthews*, 232 F. Supp. 2d. 11, 14 (E.D.N.Y. 2002) (elements of a claim for breach of contract under New York law are a contract, performance of the contract by one party, breach of the contract, and damages) (citations omitted); *John Hancock Mut. Life Ins. Co. v. King*, 1997 WL 373512 at *3 (D.N.J. March 26, 1997) (elements for a breach of contract action are the existence of a contract, breach, and resulting damages) (citations omitted); *Public Serv. Enter. Group, Inc., v. Philadelphia Elec. Co.*, 722 F. Supp. 184, 219 (D.N.J. 1989) (elements of a breach of contract under New Jersey law are proof of a contract, breach, damages, and performance by the plaintiff) (citations omitted); *Poor v. Hill*, 138 N.C. App. 19, 530 S.E.2d. 838, 843 (Ct. App. 2000) (elements of a claim for breach of contract under North Carolina law are the existence of a valid contract, and breach of that contract) (citations omitted).

56 F.3d 487, 489 (3d Cir. 1995)).  Thus, the Fourth Circuit implicitly recognized that the beginning of the limitations period indicates that a matter is ripe for adjudication.

That factor, applied to this case, strongly supports a finding that the case is ripe. The statute of limitations (in all likelihood) has commenced running on St. Paul's breach of contract claim.  Under Maryland law, in a contractual indemnity case, the limitations period normally begins to run when the payment for which indemnity is sought is made. *Sherwin-Williams v. Artra Group*, 125 F. Supp. 2d. 739, 757 (D. Md. 2001) (citations omitted).[6/]  St. Paul paid the Georgia judgment against it in December, five months ago, thus triggering the limitations period.

The principles articulated in the cases cited in the Court's show cause order -- *Charter Federal Savings Bank v. Office of Thrift Supervision*, 976 F.2d 203 (4th Cir. 1992), and *Donnalengo v. Myers*, 1999 WL 565834 (4th Cir. Aug. 2, 1999) -- are inapposite to the present facts.  In *Charter Federal*, the court found that a declaratory judgment action against the FDIC, for prospective actions it had not yet taken, could not be maintained when no injury had occurred.  976 F.2d at 209.  The court's finding that the case was not ripe was further supported by the fact that the FDIC could still have pursued two alternative courses of action, which would affect the plaintiff in different ways.  *Id.*

*Donnalengo* also is vastly different from this action.  In *Donnalengo*, the plaintiff brought an action seeking declaratory and injunctive relief for conduct that had yet to occur.  The defendant, the Chairperson of a Board of Supervisors, stated that in the future, she would prevent the plaintiff from speaking at board meetings.  1999 WL 565834, at *1-2.  The plaintiff alleged that this violated his First Amendment rights.  The

---

[6/] Because Maryland is the forum state, Maryland limitations law applies to this case. *Sherwin-Williams*, 125 F. Supp. 2d. at 756-57 (citations omitted).

court held that this dispute was not ripe "because the injury alleged [had] yet to occur and [might] never materialize," and thus that the plaintiff presented an abstract disagreement over which the court lacked subject-matter jurisdiction. 1999 WL 565834, at *3-4. The court dismissed the action because the plaintiff failed to demonstrate any injury resulting from defendants' conduct.

In this case, in contrast, the existence of all elements of a cause of action for breach of contract; the beginning of running of the limitations period; and the existence of actual injury to St. Paul, all compel a finding that this case is ripe. Indeed, as St. Paul demonstrated in Section I hereof, this case can and should be disposed of promptly by means of summary judgment. This breach of contract case is completely different from declaratory judgment cases such as *Donnalengo* and *Charter*. Unlike the plaintiffs in those cases, St. Paul already is suffering from serious financial injury, and Defendants have refused to indemnify it as they promised. Under the principles used by the federal courts to determine the ripeness of breach of contract cases, this case plainly is ripe.

Furthermore, to require St. Paul to wait for an open-ended and unpredictable period before commencing its action would be unfair to St. Paul. So far, the post-trial and appellate proceedings in Georgia have extended from August 6, 1996, when the initial trial court judgment was entered, until today, a period of more than 6½ years.

It is completely unclear when the Georgia appellate courts will issue final decisions on the matters that are now pending before them, which in any event will be completely irrelevant to this action. Substantial additional procedural steps remain to be taken in Georgia before Security's pending appeal is finally resolved there. For example, if the Georgia Supreme Court <u>grants</u> certiorari, then there will be a full briefing schedule for St. Paul and Security with respect to the issues raised. There is no timetable for a Georgia Supreme Court decision to be issued. If the Georgia Supreme Court does <u>not</u>

grant certiorari at this time, then there still will be additional briefing in the Georgia

Court of Appeals, possibly oral argument, and a decision by that court.  Once again, there

is no specific timetable on which these matters must take place.  Further, even after a

decision by the Georgia Court of Appeals, there is an opportunity for further review by

the Georgia Supreme Court by

way of certiorari, which undoubtedly will be sought by the party that does not prevail at

the Court of Appeals level.

Regardless of when the Georgia courts finally determine the merits of Security's

appeal, which St. Paul believes is moot, there is a substantial chance that the case will be

remanded to the trial court for further proceedings in accordance with the decisions of the

appellate courts.  Once again, there is no firm timetable under which such matters must

be decided -- and on the basis of prior experience in this case, it is fair to say that these

matters will not be concluded for a period of several years.

Further, as noted above, St. Paul's limitations period is probably running right

now.  If the Georgia proceedings last for several more years, as could easily happen, its

right to recover may expire before its claims are deemed "ripe."

Finally, during the entire period of delay, St. Paul will be exposed to the

possibility that one or more of the Defendants may become insolvent.  This would not

only be unfair, it would be contrary to St. Paul's rights under the Indemnity Agreements,

under which it is entitled immediate indemnity on demand.

It would be grossly unfair to subject St. Paul to such open-ended delay, when it

has fulfilled its obligations to the Defendants by providing an Appeal Bond and has

fulfilled its obligation under the Bond by paying when judgment was entered against it.

It would be especially unfair when the mere passage of time may, by virtue of the statute

of limitations, completely preclude St. Paul from exercising its indemnity rights.  There is

simply no reason for St. Paul to be required to continue to suffer a loss of millions of dollars for an indefinite period of time, waiting for decisions that have no relevance to its indemnity rights against Defendants.

## CONCLUSION

For the reasons stated, this Court should determine that this case is ripe and proceed to consider Plaintiff's motion for partial summary judgment.

Respectfully submitted,


_____ /s/
Paul F. Strain, Federal Bar No. 01255
Venable, Baetjer and Howard, LLP
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland  21201
(410) 244-7400


_____ /s/
James A. Dunbar, Federal Bar No. 007392
Katherine D. Bainbridge
Venable, Baetjer and Howard, LLP
210 Allegheny Avenue
Post Office Box 5517
Towson, Maryland  21285-5517
(410) 494-6200

*Attorneys for St. Paul Fire and Marine Insurance Company*

<u>C**ERTIFICATE OF** S**ERVICE**</u>

I HEREBY CERTIFY that on this **_23rd_** day of **_April_** , **2003**, a copy of the

foregoing **S**T**. P**AUL**'**S **R**ESPONSE TO **O**RDER TO **S**HOW **C**AUSE was mailed first class,

postage prepaid, to:

> Gregg L. Bernstein
> Martin, Snyder & Bernstein, P.A.
> Redwood Tower, Suite 2000
> 217 East Redwood Street
> Baltimore, Maryland  21202
>     and
> Reid Evers, Esquire
> Vice President and Associate General Counsel
> Transamerica Occidental Life Ins. Co.
> Post Office Box 2101
> Los Angeles, California  90051-0101
>     *Attorneys for Defendant Transamerica Occidental Life*
>     *Insurance Company*
>
> Bryan D. Bolton, Esquire
> Funk & Bolton
> 36 South Charles Street, Suite 1200
> Baltimore, Maryland  21201-3111
>     and
> Elizabeth J. Bondurant, Esquire
> Elizabeth A. Beskin, Esquire
> Carter & Ansley
> 1180 West Peachtree Street, Suite 2300
> Atlanta, Georgia 30309
>     *Attorney for Defendant Principal Mutual Life Insurance*
>     *Company*
>
> J. Snowden Stanley, Jr., Esquire
> Semmes, Bowen & Semmes
> 250 West Pratt Street, 16th Floor
> Baltimore, Maryland 21201
>         and

Lawrence S. Greengrass, Esquire
Mound, Cotton, Wollan & Greengrass
One Battery Park Plaza
New York, New York  10004

*Attorneys for Defendants American United Life Insurance Company; Transamerica Occidental Life Insurance Company; First Allmerica Financial Life Insurance Company; Connecticut General Life Insurance Company; Combined Insurance Company of America; Crown Life Insurance Company; The Equitable Life Assurance Society of the United States; Manufacturers Life Insurance Company; Phoenix Home Life Mutual Insurance Company; Sun Life Assurance Company of Canada; Swiss Re Life & Health America, Inc.; Swiss Re America Holding Corporation; Unum Life Insurance Company of America; General & Cologne Life Re of America; and Canada Life Insurance Company of America*

_____ /s/ _____
James A. Dunbar, Federal Bar No. 007392