IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ST. PAUL FIRE AND MARINE INSURANCE      *
COMPANY,
               Plaintiff,
      v.                                            *        Civil Action No.: WDQ-02-3123
TRANSAMERICA OCCIDENTAL LIFE
INSURANCE COMPANY, et al.,                  *
              Defendants.

    *   *   *   *   *   *   *   *   *

## MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

SEMMES, BOWEN & SEMMES, P.C.
250 West Pratt Street
Baltimore, MD 21201
(410) 539-5040
      -and-
MOUND COTTON WOLLAN & GREENGRASS
One Battery Park Plaza
New York, NY 10004
(212) 804-4200

**ATTORNEYS FOR DEFENDANTS**
AMERICAN UNITED LIFE INSURANCE
COMPANY, FIRST ALLMERICA FINANCIAL
LIFE INSURANCE COMPANY, CONNECTICUT
GENERAL LIFE INSURANCE COMPANY,
COMBINED INSURANCE COMPANY OF
AMERICA, CROWN LIFE INSURANCE
COMPANY, THE EQUITABLE LIFE
ASSURANCE SOCIETY OF THE UNITED
STATES, MANUFACTURERS
LIFE INSURANCE COMPANY, PHOENIX
LIFE INSURANCE COMPANY, SUN LIFE
ASSURANCE COMPANY OF CANADA,
SWISS RE LIFE & HEALTH AMERICA,
 INC., SWISS RE AMERICA HOLDING
CORPORATION, UNUM LIFE INSURANCE
COMPANY OF AMERICA, GENERAL &
COLOGNE LIFE RE OF AMERICA, and
CANADA LIFE INSURANCE COMPANY OF
AMERICA

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................... iii

SUMMARY OF ARGUMENT................................................................ 2

ARGUMENT ............................................................................................ 3

I. THE APPLICABLE SUMMARY JUDGMENT STANDARD.......................... 3

II. SUMMARY JUDGMENT MUST BE DENIED.......................................... 4

A. St. Paul Has Brought This Matter in the District of Maryland to Obtain
a Tactical Advantage and to Avoid the Georgia Courts...................................... 4

B. Contrary to St. Paul's Assertion, Maryland Choice-of-Law Rules Require
the Application of the Substantive Law of Georgia to This Dispute........................... 6

C. The Pending Appellate Litigation Between St. Paul and Security Life
in the Georgia Court of Appeals, in Which St. Paul Has Substantially
Participated, Has Established the Controlling Law of Georgia.............................. 9

D. The February 10, 2003 Order of the Georgia Court of Appeals Should
Control the Disposition of the Suit Before This Court, and Mandates
the Reduction of the Indemnity Obligations to the Extent the Judgment
is Reversed on Appeal.................................................................................... 15

E. Alternatively, the M-Pax Decision of the Georgia Court of Appeals,
Relied on by Both St. Paul and Security Life, Should Control the
Disposition of the Suit Before This Court, and Requires a Jury
Trial on the Issue of the Reasonableness of the Payment..................................... 17

F. Georgia Law Also Requires a Jury Trial on the Issue of St. Paul's
Good Faith in Making the Payment................................................................. 20

G. The Current Status of the Georgia Proceedings.......................................... 21

H. This Court Must Find Triable Issues of Fact as to St. Paul's
Good Faith and the Reasonableness of its Payment, Deny Summary
Judgment, and Either Reinstate the Stay or Dismiss the Case
Without Prejudice Pending Completion of the Georgia Appellate Process.................. 22

I. Even if This Court were to Apply New York or New Jersey Law,
as Suggested by St. Paul, a Trial on the Reasonableness of the Payment
of the Judgment and St. Paul's Good Faith Would Still be Required........................ 24

J. The Cases from Other Jurisdictions Relied on by St. Paul are Distinguishable from the Matter Before This Court, as are the Indemnification Agreements at Issue in Those Cases...........................................................……    27

K. The Indemnification Agreements Before This Court are Not Ambiguous; but Whether They are or Not, They do Not have the Meaning That St. Paul Ascribes to Them.....................................................................…..…    34

L. Issues Exist as to the Intended Operation of the Various Indemnification Agreements – Which Provide for a Total of 285% in Indemnity – and the Order in Which They Apply...............................................................…..    35

CONCLUSION...............................................................……..…    39

## TABLE OF AUTHORITIES

<u>Cases</u>

<u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 90 S. Ct. 1598,
26 L. Ed. 2d 142 (1970) ...................................................................................... 4

<u>American States Ins. Co. v. Glover</u>, 960 F.2d 149, 1992 WL
78786 (6th Cir., April 16, 1992) ........................................................................ 32

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986) ...................................................................................... 4

<u>Andre Construction Associates, Inc. v. Catel, Inc.</u>, 293
N.J. Super. 452, 681 A.2d 121 (Super. 1996) ................................................. 29, 30

<u>Assicurazioni Generali, S.p.A. v. Neil</u>, 160 F.3d 997 (4th Cir. 1998) .............. 17

<u>Associated Mechanical Contractors, Inc. v. Martin K. Eby Construction Co., Inc.</u>,
964 F. Supp. 1576 (M.D. Ga. 1997) ................................................................. 36

<u>Brogden v. Pro Futures Bridge Capital Fund, L.P.</u>, – Ga. App. –,
– S.E.2d –, 2003 WL 1480754 (March 25, 2003) .......................................... 36, 37

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S. Ct. 2548, 91 L.
Ed. 2d 265 (1986). ............................................................................................. 3

<u>Chemical Bank of New Jersey National Association v. Bailey</u>,
296 N.J. Super. 515, 687 A.2d 316 (A.D.1997) ............................................. 26

<u>Commercial Ins. Co. of Newark, New Jersey v. Pacific-Peru Construction Corp.</u>,
558 F.2d 948 (9th Cir. 1977) .......................................................................... 31

<u>Complaint of Salty Sons Fishing</u>, 191 F. Supp. 2d 631 (D. Md. 2002) .......... 4

<u>Cram v. Sun Ins. Office, Ltd.</u>, 375 F.2d 670 (4th Cir. 1967) ........................ 4

<u>Employers Ins. of Wausau v. Able Green, Inc.</u>, 749 F. Supp. 1100 (S.D. Fla. 1990) ............ 33

<u>Ericksson v. Cartan Travel Bureau, Inc.</u>, 109 F. Supp. 315 (D. Md. 1953) ........... 6, 7

<u>Fidelity and Deposit Co. of Maryland v. Bristol Steel & Ironworks, Inc.</u>,
722 F.2d 1160 (4th Cir. 1983) ................................................. 5, 30, 31, 34, 35

Fireman's Fund Ins. Co. v. Nizdil, 709 F. Supp. 975 (D. Or. 1989) ............................................. 32

Frontier Ins. Co. v. International, Inc., 124 F. Supp. 2d 1211 (N.D. Ala. 2000) ........................... 33

General Accident Ins. Co. of America v. Merritt-Meridian Construction Corp.,
975 F. Supp. 511 (S.D.N.Y. 1997) ............................................................................................. 29

General Electric Co. v. Keyser, 166 W. Va. 456, 275 S.E.2d 289 (1981) ....................................... 8

General Ins. Co. of America v. K. Capolino Construction Corp.,
903 F. Supp. 623 (S.D.N.Y. 1995) ........................................................................................ 25, 26

General Ins. Co. of America v. Merritt-Meridian Construction Corp.,
1997 WL 187372 (S.D.N.Y., April 16, 1997) ........................................................................ 24, 27

Hanover Ins. Co. v. Smith, 182 Ill. App. 3d 793, 538 N.E.2d 710 (1989) .................................... 33

H.D. McLendon v. Hartford Accident & Indemnity Co.,
119 Ga. App. 459, 167 S.E.2d 725 (1969), cert. denied (May 8, 1969) ..................... 20, 22, 24, 27

International Fidelity Ins. Co. v. Jones, 294 N.J. Super. 1, 682 A.2d 263 (A.D. 1996) .............. 26

International Fidelity Ins. Co. v. Spadafina, 192 A.D.2d 637, 596
N.Y.S.2d 453 (2d Dep't 1993) ......................................................................... 24, 28, 29, 35

Lynch v. Universal Life Church, 775 F.2d 576 (4th Cir. 1985) .................................................... 17

M-PAX, Inc. v. Dependable Ins. Co., Inc., 170 Ga. App. 93,
335 S.E.2d 591 (1985), cert. denied (Oct. 18, 1985) .............. 13, 14, 15, 17, 18, 19, 20, 22, 24, 27

Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,
475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ................................................................. 4

National Union Fire Ins. Co. v. Ranger Ins. Co., 190
A.D.2d 395, 599 N.Y.S.2d 347 (4th Dep't 1993) ........................................................................ 25

National Surety Co. v. Fulton, 192 A.D. 645, 183 N.Y.S. 237 ( 1st Dep't 1920) ........................ 25

Old Republic Surety Co. v. Reliable Housing, Inc.,
572 S.E.2d 442,  2002 WL 31687287  (N.C. App., Dec. 3, 2002) ............................................... 31

Palevac v. Mid Century Non Auto, 101 Nev. 835, 710 P.2d 1389 (1985) .................................... 27

Perkins v. Thompson, 551 So. 2d 204 (Miss. 1989) .................................................................... 26

<u>Phoenix Savings & Loan, Inc. v. Aetna Casualty and Surety Co.</u>,
381 F.2d 245 (4th Cir. 1967) ..................................................................... 4

<u>Schaffer v. City of Marietta</u>, 220 Ga. App. 382, 469 S.E.2d 479, (1996) ..................................... 36

<u>Sting Security, Inc. v. First Mercury Syndicate, Inc.</u>, 791 F. Supp. 555 (D. Md. 1992) ................ 6

<u>St. Paul Fire & Marine Ins. Co. v. Clark</u>,
255 Ga. App. 14, 566 S.E.2d 2 (2002), <u>cert. denied</u> (Sept. 6, 2002) ............................................ 10

<u>Sun Ins. Office, Ltd. of London v. Mallick</u>, 160 Md. 71, 153 A. 35 (1931) .......................... 6, 7, 8

<u>Union Trust Co. of New Jersey v. Knabe</u>, 122 Md. 584, 89 A. 1106 (1914) ............................ 7, 8

<u>Union Trust Co. of New Jersey v. Schlens</u>, 122 Md. 584, 89 A. 1116 (1914) ......................... 7, 8

<u>United States Fidelity Co. v. Sandoval</u>, 223 U.S. 227, 32 S. Ct. 298,
56 L. Ed. 415 (1912) ................................................................................................................ 30, 31

<u>United States Fidelity & Guaranty Co. v. Feibus</u>, 15 F. Supp.
2d 579 (M.D. Pa. 1998) ................................................................................................................ 32

<u>Western Surety Co. v. Medsolutions, Inc.</u>, 2003
WL 251433 (N.D. Tex., Feb. 3, 2003) ......................................................................................... 33

<u>Whipple v. American Surety Co. of New York</u>, 92 F.2d 673 (5th Cir. 1937) ........................ 19, 20

<u>Wickliffe v. Wickliffe Co., Inc.</u>,
227 Ga. App. 432, 489 S.E.2d 153 (1997), <u>cert. denied</u> (Jan. 5, 1998) ........................................ 16

## **Statutes**

28 U.S.C. § 90(b)(5)...................................................................................................5

28 U.S.C. § 1391(a)...................................................................................................5

O.C.G.A. § 10-7-30...................................................................................................23

## **Other Authorities**

Maryland Law Encyclopedia (2003 update), "Guaranty," § 1 ...........................................8

Court of Appeals of Georgia, "History of the Court of Appeals: 1906-2002"……..…..............17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ST. PAUL FIRE AND MARINE INSURANCE       *
COMPANY,

                                                      *

                 Plaintiff,

                                       Civil Action No.: WDQ-02-3123

       v.                           *

TRANSAMERICA OCCIDENTAL LIFE
INSURANCE COMPANY, et al.,

                 Defendants.

           *    *    *    *    *    *    *    *    *

**MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants AMERICAN UNITED LIFE INSURANCE COMPANY, FIRST ALLMERICA FINANCIAL LIFE INSURANCE COMPANY, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, COMBINED INSURANCE COMPANY OF AMERICA, CROWN LIFE INSURANCE COMPANY, THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, MANUFACTURERS LIFE INSURANCE COMPANY, PHOENIX LIFE INSURANCE COMPANY, SUN LIFE ASSURANCE COMPANY OF CANADA, SWISS RE LIFE & HEALTH AMERICA, INC., SWISS RE AMERICA HOLDING CORPORATION, UNUM LIFE INSURANCE COMPANY OF AMERICA, GENERAL & COLOGNE LIFE RE OF AMERICA, and CANADA LIFE INSURANCE COMPANY OF AMERICA, by their undersigned attorneys, respectfully submit this opposition to the motion of

plaintiff, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, for partial summary

judgment.[1]

## SUMMARY OF ARGUMENT

- St. Paul issued a surety bond in the Early County, Georgia Superior Court in connection with the judgment against Security Life and in favor of the Clarks.

- After several appellate decisions and remands, the judgment is currently on appeal by Security Life to the Georgia Court of Appeals and may be substantially reduced.

- Without any legal compulsion to do so, St. Paul paid the judgment in full – more than $7.5 million – instead of joining in the appeal, notwithstanding its knowledge that Security Life had appealed on the same grounds as St. Paul also raised before the Early County court.

- The Georgia Court of Appeals, with notice to St. Paul and full opportunity for it to be heard, has expressly ruled that any reduction of the judgment on appeal will reduce the indemnity obligations of Security Life and its holding company, SAFE.

- Defendants, whose indemnification agreements drafted by St. Paul are not materially different from those of Security Life and SAFE, stand in the same position as Security Life and SAFE as respects their ultimate indemnity obligations to St. Paul, and any reduction of the judgment against Security Life on appeal will likewise reduce the indemnification obligations of the defendants.

- More than two years ago, defendants' attorneys told St. Paul by letter that they would regard any payments St. Paul made in the absence of a court order "sustained at the end of the judicial process" as voluntary and not subject to reimbursement by the defendants.

- In the absence of an automatic reduction of their indemnification obligations upon reversal on appeal, defendants are entitled to a jury trial on the issues of St. Paul's reasonableness and good faith in the payment of the judgment before the final amount thereof was conclusively established on appeal.

- The indemnification agreements drafted by St. Paul are not ambiguous; but, whether or not they are, they do not mean what St. Paul claims they do, as the agreements lack the specific provisions that govern virtually all of the cases cited in St. Paul's briefs.

- Questions of fact exist as to the parties' intent regarding the operation of the various indemnification agreements – which provide for a total of 285% in indemnity – and the order in which they apply.

---

[1] Defendant TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY, represented by other counsel, has made a separate motion. Defendant PRINCIPAL MUTUAL LIFE INSURANCE COMPANY also has other counsel.

- Summary judgment must be denied, and the Court should stay this action, or dismiss it without prejudice, pending the final resolution of the Georgia appellate controversy between St. Paul and Security Life.

Under Maryland's choice-of-law rules, Georgia substantive law applies to this lawsuit. Georgia case law, including the recent order of the Georgia Court of Appeals in the pending dispute between St. Paul and Security Life (Exh. 1), either mandates the reduction of the indemnitors' obligations if the judgment paid by St. Paul is reduced on appeal or requires a jury trial on the issues of the reasonableness and good faith of St. Paul's payment in the face of Security's appeal and before the final amount of the judgment was conclusively established. The cases cited by St. Paul in its various briefs are irrelevant both because they do not concern Georgia law and because – except for two matters involving extraordinary circumstances leaving the surety no choice but to pay – all of St. Paul's cases construe indemnification agreements far broader than those drafted by St. Paul and before this Court. The motion for summary judgment must be denied, and the action before this Court should be stayed, or dismissed without prejudice, until the pending Georgia appeal is finally resolved.

## ARGUMENT

## I. THE APPLICABLE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if, after the Court views the record as a whole in a light most favorable to the non-moving parties, it finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment is not appropriate "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under

any circumstances." Complaint of Salty Sons Fishing, 191 F. Supp. 2d 631, 635 (D. Md. 2002),

quoting Phoenix Savings & Loan, Inc. v. Aetna Casualty and Surety Co., 381 F.2d 245, 249 (4th

Cir. 1967). The party resisting summary judgment is entitled to all favorable inferences to be

drawn from the evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598,

26 L. Ed. 2d 142 (1970); Cram v. Sun Ins. Office, Ltd., 375 F.2d 670, 674 (4th Cir. 1967).

While summary judgment is useful in dispensing with factually unsupported claims, the

Court should act with caution in granting summary judgment. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). It is not the Court's role to resolve

factual issues; it only determines whether factual issues exist, and must resolve any ambiguities

and draw all inferences in favor of the non-moving parties. Matsushita Electrical Industrial Co.,

Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

## II. SUMMARY JUDGMENT MUST BE DENIED

In its Opposition to Motion for Stay of Proceedings, St. Paul asserted that this matter is

appropriately before the District of Maryland, that the dispute is altogether unrelated to pending

Georgia court proceedings between St. Paul and Security Life (p. 15), and that New York or

New Jersey substantive law governs (pp. 14-15 n. 8). St. Paul is wrong on all counts.

## A. St. Paul Has Brought This Matter in the District of Maryland to Obtain a Tactical Advantage and to Avoid the Georgia Courts

Because the fairness of this Court is beyond question, none of the defendants in this case

has asserted improper venue. Nevertheless, St. Paul's claimed justifications for choosing this

District cannot pass muster under federal law. It is disingenuous for St. Paul to argue

(Opposition to Stay, p. 15) that "[t]here has been no procedural fencing or forum shopping by St.

Paul." Although St. Paul alleges at ¶ 20 of its Amended Complaint that "a substantial part of the

events giving rise to the claim occurred in Maryland," the best it can offer in support of that assertion is that Maryland "is the office location of the responsible parties at St. Paul." (Opposition to Stay, p. 15.)   Alternatively, St. Paul has offered as its justification for venue in this District that "defendants are corporations subject to personal jurisdiction in Maryland" (Amended Complaint, ¶ 20) and "St. Paul is able to obtain jurisdiction over the vast majority of the Defendants in this Court." (Opposition to Stay, p. 15.)

St. Paul must know these are not proper bases for placing venue in the District of Maryland.   Clearly, no "substantial part of the events or omissions giving rise to the claim" occurred in this District as 28 U.S.C. § 1391(a) requires, nor, as the statute contemplates, do all of the defendants in this action reside in Maryland; indeed, according to ¶¶ 2-19 of the Amended Complaint, none is a Maryland resident.   Accordingly, venue in this District on the basis of "personal jurisdiction" would be a proper alternative under § 1391(a) only "if there is no district in which the action may otherwise be brought."

But there certainly is another District – the Albany Division of the Middle District of Georgia – in which this action might have been brought because a "substantial part of the events or omissions giving rise to the claim" indisputably occurred in Early County, Georgia.   See 28 U.S.C. § 90(b)(5).   It is obvious that St. Paul is trying to do everything it can to stay out of Georgia – whose state Court of Appeals has already ruled unfavorably to St. Paul on the very issues raised by the case at bar – and is hopeful that, by commencing the action in this District, located in the Fourth Circuit, it may obtain the alleged benefit of what St. Paul (Opposition to Stay, p. 10) terms "the leading case" of Fidelity and Deposit Co. of Maryland v. Bristol Steel & Ironworks, Inc., 722 F.2d 1160 (4th Cir. 1983).

In short, St. Paul knows that the Georgia Court of Appeals would summarily reject its position herein or order a jury trial on the issues of reasonableness and good faith in St. Paul's premature payment of the judgment, while it hopes that the Fourth Circuit will instead "forcefully" (Opposition to Stay, p. 10) grant summary judgment in its favor. While this Court should not countenance such blatant forum-shopping, it can solve the problem simply by applying the substantive law of Georgia as Maryland's choice-of-law rules require.

## B. Contrary to St. Paul's Assertion, Maryland Choice-of-Law Rules Require the Application of the Substantive Law of Georgia to This Dispute

Obviously, St. Paul is doing its best to avoid Georgia law, insisting that, as to all defendants but Transamerica[2], New York or New Jersey substantive law governs under Maryland choice-of-law principles. (Opposition to Stay, pp. 14-15 n. 8; Response to Order to Show Cause, p. 10 n. 2.) Here again, St. Paul is wrong.

St. Paul cites two Maryland cases in support of its claim that New York or New Jersey law applies, Sun Ins. Office, Ltd. of London v. Mallick, 160 Md. 71, 153 A. 35 (1931), and Ericksson v. Cartan Travel Bureau, Inc., 109 F. Supp. 315 (D. Md. 1953). These cases hold that under Maryland conflicts principles this Court must apply the substantive law of the state "where the last act which makes the agreement a binding contract is performed." Sun Ins. Office, 153 A. at 39; Ericksson at 317. But both of these cases concern insurance policies, where "the last act . . . performed" that makes the agreement "a binding contract" is usually the delivery of the policy and payment of the premiums, with the result that it is the state where those acts take place whose substantive law governs the contract. Sting Security, Inc. v. First Mercury Syndicate, Inc., 791 F. Supp. 555, 558 (D. Md. 1992). St. Paul's choice-of-law analysis would

---

[2] St. Paul asserts that North Carolina substantive law applies to Transamerica.

properly apply to such cases. Under settled Maryland law, however, different considerations apply to guaranty agreements such as the case before this Court.

The cases relied on by St. Paul actually reinforce defendants' position.  Citing <u>Union Trust Co. of N.J. v. Knabe</u>, 122 Md. 584, 89 A. 1106 (1914), the court in <u>Sun Ins. Office</u>, 153 A. at 40, made clear that in each case the court must determine as a matter of fact "where was the last act performed which made . . . the contract . . . a binding obligation between the parties." Likewise, in <u>Ericksson</u> at 317, the court held that "the place where the last act . . . is performed . . . depends upon the facts of the particular case."

It is evident in the case at bar that under Maryland choice-of-law principles Georgia substantive law governs this controversy.  In <u>Knabe</u>, 89 A. at 1114, the court held: "we must first determine whether the guaranty was made in Maryland or . . . New Jersey, and that involves a consideration of [Knabe's] undertaking."  The court quoted the endorsement: "'<u>In consideration of the making</u>, at the request of the undersigned, <u>of the loan evidenced by the within note</u> upon the terms thereof . . ., the undersigned hereby guarantee to the Union Trust Company of New Jersey . . . the prompt payment of the said loan when due. . . .'"  <u>Id.</u>  (Emphasis added.)

Finding the guaranty "executory," and not "binding" until "the making of the loan," the Maryland court held that "the indorsement [sic] on the note . . . did not become binding . . . until the Trust Company accepted [Knabe's] offer to guarantee the payment of the note *by making the loan.*"  <u>Id.</u>  (Italics in original.)  Because "the offer to guarantee the note was accepted by making the loan in . . . New Jersey," "the guaranty in question must be regarded as a New Jersey contract" to be read under "the law of the state in which the contract was made."  <u>Id.</u> at 1115. <u>See also</u> <u>Union Trust Co. of New Jersey v. Schlens</u>, 122 Md. 584, 89 A. 1116 (1914).

Not only <u>Sun Ins. Office</u>, 153 A. at 40, but also the 2003 update to the Maryland Law Encyclopedia confirms the currency of these cases, citing both <u>Knabe</u> and <u>Schlens</u> at "Guaranty," § 1 for the proposition that "[t]he contract of guaranty is made in the state where the making of the loan is done, since the making of the loan is the last act to make it a binding obligation." <u>See also</u> <u>General Electric Co. v. Keyser</u>, 166 W. Va. 456, 275 S.E.2d 289 (1981), holding: "Usually, the last act necessary to make a contract of guaranty binding is the loan of money under the terms of the underlying obligation." 275 S.E.2d at 296. In <u>Keyser</u>, "the last act necessary to bind the parties was the actual loan by G.E. to Hamilton," as the guarantor's "promise to perform an act . . . ripened into a contract only when the loan was made to the underlying debtor." <u>Id.</u> Because "the loan of money [was] in California . . . California law governs the guaranty." <u>Id.</u>

How this rule applies to the case at bar is obvious.     All of the defendants' indemnification agreements declare that the guaranties are made "in consideration of your Company [St. Paul] executing and delivering a Supersedeas Bond" to be filed in Early County, Georgia.     As in the Maryland cases <u>Knabe</u> and <u>Schlens,</u> the "consideration" for each guaranty was not the mere promise to issue the bond but its actual execution and delivery to the Early County Superior Court in Georgia.     According to ¶ 21 of the Amended Complaint, it was in November 1996 that the defendants "agreed to indemnify St. Paul in connection with the execution and delivery by St. Paul of a supersedeas bond."     According to ¶ 25, it was not until December 2, 1996 that St. Paul filed the bond with the Georgia court.     The delivery to the court in Early County, Georgia was the last act performed that turned an executory, unilateral contract into a "binding obligation between the parties." <u>Sun Ins. Office</u>, 153 A. at 40.     Because the bond

was delivered and filed in Georgia, it is the substantive law of Georgia that governs this controversy under settled Maryland conflicts-of-laws principles.

## C. The Pending Appellate Litigation Between St. Paul and Security Life in the Georgia Court of Appeals, in Which St. Paul Has Substantially Participated, Has Established the Controlling Law of Georgia

St. Paul has asserted (Summary Judgment Brief, p. 13) that the current Georgia proceedings have no bearing on the defendants' obligations to pay under their indemnification agreements; but that is clearly not so inasmuch as it is the substantive law of Georgia that applies to the case at bar. St. Paul has also asserted (Response to Order to Show Cause, pp. 8-9) that it had no opportunity to participate in the proceedings before the Georgia Court of Appeals that led to the February 10, 2003 order (Exh. 1) holding that "a reversal of the judgment on the grounds urged by Security will reduce any potential obligation that Security may have to St. Paul to indemnify it for payment of the judgment." This contention, too, is groundless.

The current Georgia appellate proceedings relating to the February 10, 2003 order of the Court of Appeals have spawned numerous motions, briefs, and orders, many of which are referred to below. Attached as exhibits are the following documents bearing on this controversy: Appellees' Motion to Dismiss Appeal, or, in the Alternative, to Substitute Parties (Exh. 2); Appellant Security Life's Response to Appellees' Motion to Dismiss Appeal, or, in the Alternative, to Substitute Parties (Exh. 3); St. Paul's Motion for Reconsideration (Exh. 4); St. Paul's Motion to Dismiss (Exh. 5); Brief in Support of St. Paul's Motions for Reconsideration and to Dismiss (Exh. 6); February 24, 2003 Court of Appeals order denying St. Paul's Motion to Dismiss (Exh. 7); Security Life's Opposition to St. Paul's Motion for Reconsideration (Exh. 8); Reply Brief in Support of St. Paul's Motion for Reconsideration (Exh. 9); March 14, 2003 Court of Appeals order denying St. Paul's Motion for Reconsideration (Exh. 10); St. Paul's Petition for

Certiorari (Exh. 11); Security Life's Response to Petition for Certiorari (Exh. 12); April 29, 2003

Court of Appeals order extending time to file brief for appellees (Exh. 13); and St. Paul's Motion

to Stay Proceedings in the Georgia Court of Appeals Pending Disposition of Petition for Writ of

Certiorari to This Court (Exh. 14).

The following is the relevant history of the dispute between St. Paul and Security Life

insofar as it bears upon the law of Georgia that governs the case before this Court. By the sixth

reported decision in the controversy between the plaintiffs Clark and Security Life, wherein St.

Paul was also a named defendant, St. Paul Fire & Marine Ins. Co. v. Clark, 255 Ga. App. 14, 566

S.E.2d 2 (2002), cert. denied (Sept. 6, 2002), the Georgia Court of Appeals reversed the trial

court's award of attorneys' fees, litigation expenses, and punitive damages, leaving only the

compensatory damages of $4,073,000 awarded on the Clarks' fraud claim. On remand to the

Early County Superior Court, the parties filed separate motions for entry of judgment. Security

urged the trial court not to include improper amounts of pre- and postjudgment interest,

attorneys' fees, and litigation expenses in the new judgment. (Exh. 12, pp. 2-3.) St. Paul

expressly agreed with Security's position before the trial court: "St. Paul adopts and incorporates

the arguments that have been raised and the objections made by Security Life with respect to the

proposed judgment on remand by the Plaintiffs." (Transcript, p. 19, from appeal of 2002 orders

entered by trial court on remand, quoted at Exh. 12, p. 8.) The trial court substantially agreed

with the Clarks, and entered judgment against both Security Life and St. Paul for $7,481,950.53,

which purported to be the compensatory award plus pre- and postjudgment interest, less setoffs.

(Exh. 12, pp. 2-3.)

Security timely filed its notice of appeal, asserting on appeal that the trial court erred in

its awards of pre- and postjudgment interest. (Exh. 12, p. 3.) In the words of Security, "St. Paul

chose not to appeal, but instead <u>voluntarily paid</u> the judgment, plus interest." (Exh. 12, p. 3.) (Emphasis added.)   The Clarks had previously made the identical observation: "With full knowledge of all the facts and issues, and having the benefit of experienced and competent legal counsel, Defendant St. Paul did not file a notice of appeal, but instead chose to pay the Appellees the sum of $7,527,513.91. . . ." (Exh. 2, p. 1.)  "Appellant cannot recover from Appellees any part of the amount St. Paul <u>voluntarily paid</u> Appellees with full knowledge of the facts and issues." (Exh. 2, p. 2.)  Thus, if there is one thing that the Clarks and Security Life agree on, it is that St. Paul "voluntarily paid" the full judgment notwithstanding that Security Life had objected thereto and filed a notice of appeal therefrom.

St. Paul, having paid the judgment, succeeded to the Clarks' rights against Security Life. Accordingly, the Clarks moved in the Georgia Court of Appeals, in the alternative, either to dismiss Security's appeal against the Clarks on the ground that St. Paul had paid the full judgment or to substitute St. Paul as the appellee instead of the Clarks. (Exh. 2.)  The Clarks' motion papers were served timely on both Security's and St. Paul's attorneys.   (Exh. 2, Certificate of Service.)   Security filed opposing papers, and likewise served them timely on the Clarks' and St. Paul's attorneys. (Exh. 3, Certificate of Service.)  In its Response, Security asserted: "Because St. Paul has demanded indemnification from Security, a reversal of the judgment on the grounds urged by Security in its appeal – that the trial court erroneously awarded prejudgment and postjudgment interest – will reduce any potential obligation that Security may have to St. Paul to indemnify it for payment of the judgment.." (Exh. 3, p. 1.)

Security argued in its opposing papers that, "[a]s surety, St. Paul has demanded to be indemnified by Security's holding company for any loss resulting from payment on the supersedeas bond" (Exh. 3, p. 2), and Security appended a copy of St. Paul's November 18, 2002

letter to Security American Financial Enterprises (SAFE), Security Life's holding company, demanding that SAFE "satisfy this judgment" within ten days or St. Paul would "fulfill its obligations under the bond and seek recovery from SAFE." (Exh. "A" to Exh. 3.) Accordingly, Security urged that "[r]eversal of the awards of prejudgment and postjudgment interest to the Clarks, which Security is pursuing on appeal, will benefit Security against any indemnity claim by St. Paul against Security." (Exh. 3, p. 2.) Security thus made it clear to the Court of Appeals that it was the indemnification obligations of Security and its guarantor SAFE that were at issue.

Notwithstanding that it had been served with both sides' motion papers, St. Paul chose not to participate on the motion. In the circumstances, its decision not to contest the contentions of either the Clarks or Security Life can only be regarded as a tactical decision to waive the right to be heard.

By order dated February 10, 2003 (Exh. 1), the Georgia Court of Appeals ruled that St. Paul should be substituted as the appellee and refused to dismiss the appeal "even though . . . St. Paul, as surety on the supersedeas bond, paid the full amount of the judgment." The court's reasoning was that

> St. Paul has demanded indemnification from Security, and a reversal of the judgment on the grounds urged by Security will reduce any potential obligation that Security may have to St. Paul to indemnify it for payment of the judgment.

It is noteworthy that the Court of Appeals used virtually the same language as Security Life had employed at p. 1 of its Response to the Motion to Dismiss Appeal. (Exh. 3.) Nor can there be any doubt that, in referring to St. Paul's demand for "indemnification from Security," the Court of Appeals, like Security Life in its Response, had specific reference to the November 18, 2002 letter from St. Paul to Security's holding company, SAFE, in which St. Paul demanded that SAFE pay the judgment or St. Paul would pay it and seek indemnification from SAFE. (Exh.

"A" to Exh. 3.)   In short, there can be no doubt that the Georgia Court of Appeals meant what it said when it wrote that the issues before it implicated the "potential obligation . . . to indemnify" or when it held that the indemnification obligation would be reduced upon a reversal on the grounds urged by Security Life.

One of St. Paul's arguments in this Court seems to be that the order of the Georgia Court of Appeals should be disregarded as St. Paul had no ability or opportunity to contest it.  To the contrary, it has already been demonstrated that, having been served with both sides' motion papers, in reality St. Paul could have participated in the determination of the issues if it had chosen to, and it deliberately waived that right.  But it is equally important to note that, immediately following the February 10, 2003 order, St. Paul – unhappy with the result – took affirmative steps to overturn the order, by moving separately on February 20, 2003 both for dismissal of the appeal and for reconsideration of the February 10 order. (Exhs. 4, 5.)   St. Paul submitted a single, combined Brief to the Georgia Court of Appeals in support of both motions. (Exh. 6.)

In its Brief, St. Paul relied on the important Georgia case of <u>M-Pax, Inc. v. Dependable Ins. Co., Inc.</u>, 176 Ga. App. 93, 95, 335 S.E.2d 591 (1985), <u>cert. denied</u> (Oct. 18, 1985), for the proposition that a Georgia statute barred the "surety's indemnitors from 'go[ing] behind' [the] amount of [the] judgment paid by [the] surety, which was 'conclusive' in [the] action against [the] indemnitor." (Exh. 6, p. 6.)  Thus St. Paul clearly recognized that it was the obligation to indemnify that was the subject of the Court of Appeals' February 10, 2003 order.  Yet at the same time St. Paul argued (Exh. 6, pp. 7-8 n. 1) that the February 10 order could not fairly be construed as affecting St. Paul's rights under the "written indemnity agreement between it and

Security," and asked the court to clarify this point by amending its order even in the absence of reconsideration.

Before receiving any responsive brief from Security Life, the Georgia Court of Appeals on February 24, 2003 denied St. Paul's motion to dismiss (Exh. 7), thus reaching the same conclusion after reading St. Paul's Brief as the court had reached before St. Paul belatedly chose to participate. Following Security's Opposition Brief, which was limited to the question of whether St. Paul was properly a party to the appeal (Exh. 8), and a Reply from St. Paul that again asserted that its "indemnity rights are the subject of its written indemnity agreement with Security," which was "not before the Court" (Exh. 9, pp. 7-8 n. 2) and again discussed the purported conclusive impact of M-Pax, the Court of Appeals on March 14, 2003 denied St. Paul's motion for reconsideration and failed to provide the clarification that St. Paul argued was necessary. (Exh. 10.)

In its Reply (Exh. 9, pp. 9-10), St. Paul analyzed M-Pax, which it obviously regarded as controlling authority in Georgia, in considerable detail: "[T]he owner filed suit against the principal on the contract and the surety on the performance bond. Judgment was entered against the principal and surety, jointly and severally. . . . The surety paid the judgment and then brought an action against its indemnitors (who included the principal M-Pax, its president, and his wife) to recover on a written contract of indemnity. . . . The indemnitors sought to establish that the surety had not availed itself of certain available defenses in the action on the performance bond. . . . The trial court refused to allow the indemnitors to raise such an issue against the surety. This Court . . . refus[ed] to allow the indemnitors to challenge the payment of the judgment. . . ."

Thus St. Paul – clearly recognizing that the broader question decided by the Court of Appeals' February 10, 2003 order and at issue on St. Paul's motion for reconsideration was whether contractual indemnitors could challenge the surety's payment of the judgment – argued to the Court of Appeals that its prior decision in M-Pax was on all fours with the issues determined by the court's February 10 order and required reconsideration of that order. Clearly, the Georgia Court of Appeals, by denying St. Paul's motion for reconsideration, disagreed with St. Paul's attempt to equate the facts in M-Pax with those controlling the current controversy. There simply can be no doubt that St. Paul had ample opportunity to brief and reargue the February 10, 2003 Court of Appeals order on its merits, and that St. Paul lost on the merits when the court denied its motions to dismiss and for reconsideration. Indeed, St. Paul has conceded that the order denying reconsideration "affirmed" the Court of Appeals' February 10, 2003 order. (Exh. 11, p. 2.)

**D. The February 10, 2003 Order of the Georgia Court of Appeals Should Control the Disposition of the Suit Before This Court, and Mandates the Reduction of the Indemnity Obligations to the Extent the Judgment is Reversed on Appeal**

There can be no legitimate dispute that the Court of Appeals held on February 10, 2003 that St. Paul's indemnitors Security Life and SAFE would be entitled to a reduction of their indemnity obligations to St. Paul to the extent that the judgment against Security – which St. Paul had paid in full – was reduced on appeal. The governing language of all of the indemnification agreements – those of Security Life, SAFE, and the defendants herein – is essentially the same. Security Life must indemnify St. Paul against

> any or all loss or expense of whatever nature which the Company
> shall or may for any cause, at any time, sustain for or by reason or
> in consequence of the Company having executed said bond.

15

(Exh. 15.)  SAFE is bound to the same terms as Security Life.  (Exh. 15.)  The language of the

other indemnity agreements – those of the defendants before this Court – is not materially

different and, if anything, is less favorable to St. Paul, requiring indemnification for

> all loss, damages, claims, costs, expenses and attorney's fees
> which you may incur by reason of you having furnished the
> aforesaid bond. . . .

(Exh. 16, collectively.)

Perforce, the order of the Georgia Court of Appeals – a court of statewide jurisdiction –

in favor of Security Life and its holding company, SAFE, expresses the current appellate law of

Georgia on the entitlement of indemnitors to the reduction of their obligations to indemnify upon

a partial reversal reducing the amount of damages.  Therefore, the same principles ought to be

applied by this Court in determining the indemnity obligations under Georgia law of the

defendants herein, whose indemnification language is substantially the same as that of Security

Life and SAFE.  Indeed, but for an anomaly of Georgia collateral estoppel law, requiring the full

identity of parties, that the Georgia Court of Appeals in Wickliffe v. Wickliffe Co., Inc., 227 Ga.

App. 432, 489 S.E.2d 153, 156 (1997), cert. denied (Jan. 5, 1998), recently suggested the

Georgia Supreme Court discard in favor of the "modern trend regarding mutuality" that the

Court of Appeals had uniformly applied commencing in 1993, the February 10, 2003 order

would probably have preclusive effect against St. Paul, as the losing party in Georgia, in the case

at bar.

In any event, inasmuch as the substantive law of Georgia applies to St. Paul's claims

asserted before this Court and the February 10, 2003 order of the Georgia Court of Appeals sets

forth a clear statement of that law, it is apparent that current Georgia appellate law would permit

the defendants herein to reduce their indemnity obligations to the extent the judgment against

Security Life is reduced on appeal.   The Fourth Circuit has held that "ordinarily, a federal court should follow [the] decisions of [the] intermediate state Court of Appeals."   Lynch v. Universal Life Church, 775 F.2d 576, 580 (4th Cir. 1985).   See also Assicurazioni Generali. S.p.A. v. Neil, 160 F.3d 997, 1002 (4th Cir. 1998).   Furthermore, "[t]he Court of Appeals of Georgia is unique among American appellate tribunals.  It is not an intermediate court such as exists in most states.  Rather, this Court may be described as a court of final jurisdiction, subject to certiorari, with statewide original appellate jurisdiction of all cases," subject to limited exceptions inapplicable to the case at bar.  Court of Appeals of Georgia, "History of the Court of Appeals: 1906-2002," p. 1, available at http://www.appeals.courts.state.ga.us/history/history.html.   Thus this Court is bound to follow the law of Georgia as set forth in the February 10, 2003 order of the Court of Appeals.

### E. Alternatively, the M-Pax Decision of the Georgia Court of Appeals, Relied on by Both St. Paul and Security Life, Should Control the Disposition of the Suit Before This Court, and Requires a Jury Trial on the Issue of the Reasonableness of the Payment

St. Paul has now petitioned the Georgia Supreme Court for certiorari (Exh. 11), and both St. Paul and Security Life have submitted their legal arguments on the issues to Georgia's highest court for review.  (Exhs. 11, 12.)  Once again St. Paul has relied principally on the 1985 opinion of the Court of Appeals in M-Pax, Inc. v. Dependable Ins. Co., Inc., repeating (Exh. 11, pp. 13-14) the assertions previously made in St. Paul's Court of Appeals Reply Brief (Exh. 9) that in M-Pax the Court of Appeals had affirmed the trial court's holding that the indemnitors could not raise as an issue against the surety that, before paying the judgment for which it sued the indemnitors, the surety had not availed itself of certain defenses in the action in which the judgment was entered.  Again St. Paul has explicitly recognized that what is at stake in the Court of Appeals' February 10, 2003 order is whether or not, under Georgia law, contractual

17

indemnitors have the right to have their indemnity obligations reduced if the judgment that the surety has fully paid is reduced on appeal.

Security Life's Response to the Petition for Certiorari (Exh. 12) reminds the Supreme Court at p. 8 that, after agreeing with Security's position before the trial court on remand, St. Paul voluntarily paid the full amount of the judgment – with notice of Security's objections and having asserted its own objections before the trial court – even after Security Life appealed, and before either Security Life or St. Paul was conclusively bound in the amount paid.  Security's brief then proceeds to distinguish the M-Pax holding "from the facts of this case."  (Exh. 12, p. 8.)

According to Security Life (Exh. 12), in the initial case against the principal M-Pax and the surety, the court conclusively established the amount of the judgment, and neither M-Pax nor the surety contested that amount.  It was for that reason that, in the subsequent and separate case brought by the surety against  the principal and the other indemnitors  to recover the amount of the judgment against the principal and surety that the surety had paid, the trial court and the Court of Appeals barred the surety from belatedly claiming that the surety "had not availed itself of certain defenses which were available to it in [the previous] action."  M-Pax, 335 S.E.2d at 594.  (Exh. 12, p. 8.)

The defendants at bar submit that a key circumstance distinguishing M-Pax from the current case and from the February 10, 2003 order are that, after the surety in M-Pax introduced "prima facie evidence of payment" – which under the indemnification contract there at issue constituted "'prima facie evidence of the propriety thereof and of the indemnitor's liability therefor to the company'" – "the defendants did not seek by cross-examination or otherwise to challenge the propriety or reasonableness of these payments."  It was only for that reason "that

the trial court did not err in directing a verdict for their recovery." M-Pax, 335 S.E.2d at 94. This language clearly demonstrates that the indemnitors herein may make such a challenge under Georgia law.

As Security Life argues at p. 9 of its Response to the Petition for Certiorari (Exh. 12), unlike the circumstances in M-Pax, "Security challenged the amount of the trial court's award before its surety, St. Paul, paid the judgment. In addition, Security is not seeking to refute the judgment amount and the amount paid by the surety in a separate and subsequent action. Instead, Security seeks to refute this amount in the instant action by means of an appeal. Thus, M-Pax does not require that Security's appeal of the trial court's judgment be dismissed because the appropriate amount of the judgment is still in question." According to Security, any other rule "would effectively preclude appellants from invoking their right to contest improper judgments" paid by their sureties. (Exh. 12, p. 9.)

One federal case, Whipple v. American Surety Co. of New York, 92 F.2d 673 (5th Cir. 1937), considered a similar issue under Georgia law. There, unlike the current case, "[t]he surety did not pay a debt for which the principal was not bound, or fail to assert any good defense to it" in the underlying lawsuit against the surety. Id. at 674. Moreover, Whipple, the principal and indemnitor, although not a party to the underlying lawsuit, "knew of the suit and participated in it by testifying," but "it is not claimed that Whipple suggested or requested" that the surety raise the alleged defense. Id. Thus Whipple, like M-Pax, strongly suggests that in Georgia indemnitors may be entitled to relief from reimbursement where the principal has timely raised objections to the judgment paid by the surety.

In the current case, Security Life and St. Paul jointly disputed the amount of the judgment against Security and participated equally in earlier appeals. In addition, they both opposed the

imposition of the current award upon remand to the trial court.  When Security pursued the pending appeal, St. Paul was well aware of Security's objections yet freely chose to pay the entire judgment without awaiting the appellate court's decision.  St. Paul's payment of the judgment amount without regard for Security Life's objections distinguishes the case at bar from the holdings in M-Pax and Whipple, where no objections were timely interposed.  At any rate, both of these decisions clearly would have permitted the indemnitors to take issue with the propriety of the surety's conduct if, as here, the principal had timely made its own protests known.

**F. Georgia Law Also Requires a Jury Trial on the Issue of St. Paul's Good Faith in Making the Payment**

In addition to the question of the reasonableness of the payment, under Georgia law the defendants are entitled to a jury trial as to St. Paul's good faith in paying the full judgment during the pendency of Security Life's appeal.    H.D. McLendon v. Hartford Accident & Indemnity Co., 119 Ga. App. 459, 167 S.E.2d 725 (1969), cert. denied (May 8, 1969).    In McLendon, 167 S.E.2d at 726, the broad indemnification agreement expressly permitted payments by the surety "in good faith under the belief that it is or was liable for the amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether such liability, necessity or expediency existed or not"; but the court nevertheless ordered a jury trial on the surety's good faith in making the payment.  Here, to the contrary, the indemnification agreements drafted by St. Paul have no such broad language.

Inasmuch as there has been no discovery in the current case, defendants herein have not yet been able to develop all of the potential factual issues; but it is indisputable that St. Paul, having joined with Security Life in opposing the amount of the judgment upon remand,

thereafter decided to pay the full judgment notwithstanding Security's appeal therefrom on the very grounds previously argued by St. Paul as well as Security.  These circumstances have caused both Security Life and the Clarks – who would agree on little else – to describe St. Paul's payment in their Georgia legal papers as having been "voluntarily" made.

Moreover, St. Paul paid the judgment in the face of the November 17, 2000 letter from this law firm (Exh. 17), also annexed to the Amended Complaint herein as part of Exhibit "C," in which St. Paul was warned as follows: "While we understand the concept that liability is con-extensive, that would not be the case if St. Paul were a 'volunteer'.  Absent court order, if St. Paul were to make any payments voluntarily under color of the bond, the reinsurers would clearly not be obligated given the current procedural posture of the case.  Of course, this discussion is all theoretical, since we understand that St. Paul will not make any payments until a court orders it to do so and that order is sustained at the end of the judicial process."

Accordingly, notwithstanding the lack of opportunity for discovery to date, there are already ample grounds in this case under Georgia law for ordering a jury trial on the issue of St. Paul's good faith in paying the judgment in the face of Security Life's pending appeal and the defendants' warning not to do so until "the end of the judicial process."

### G. The Current Status of the Georgia Proceedings

The current status of the Georgia litigation is as follows.  On April 2, 2003 St. Paul petitioned the Georgia Supreme Court for certiorari; both parties have submitted their arguments, and the matter is sub judice.  Because of the pendency of the Certiorari Petition, the Georgia Court of Appeals has enlarged St. Paul's time for filing the appellee's brief on the appeal from the judgment until May 27, 2003.  (Exh. 13.)  On April 29, 2003 St. Paul moved in the Supreme Court to stay all proceedings in the Court of Appeals until the disposition of the Petition for

Certiorari (Exh. 14); that request is also <u>sub judice</u>.  If the Georgia Supreme Court grants certiorari, then the highest court of Georgia will determine whether and to what extent the February 10, 2003 order of the Georgia Court of Appeals should be sustained.  If the Supreme Court denies certiorari, then the Court of Appeals will proceed to hear and decide Security Life's appeal from the amount of the judgment.  Following the determination of that appeal, the Georgia Supreme Court will once again have the opportunity for discretionary review of the Court of Appeals' holding, including the February 10 order.

**H.  <u>This Court Must Find Triable Issues of Fact as to St. Paul's Good Faith and the Reasonableness of its Payment, Deny Summary Judgment, and Either Reinstate the Stay or Dismiss the Case Without Prejudice Pending Completion of the Georgia Appellate Process</u>**

In these circumstances, this Court – bound to apply the substantive law of Georgia – must deny summary judgment on either of two bases.  The Court's first option is to apply the February 10, 2003 order of the Georgia Court of Appeals to the case at bar and deny summary judgment by holding as a matter of law that, under current Georgia law, the defendants herein may reduce their indemnification obligations to St. Paul to the extent that Security Life is successful on its pending appeal.  The second option is to apply the prior decision of the Court of Appeals in <u>M-Pax</u>, 335 S.E.2d at 94, upon which both St. Paul and Security Life have consistently relied, and deny summary judgment by holding that, under Georgia law – St. Paul having paid the full judgment notwithstanding that Security Life disputed its amount and appealed therefrom – the defendants herein are entitled to a jury trial at which they may "seek by cross-examination or otherwise to challenge the propriety or reasonableness of these payments" by St. Paul and that, as well, defendants are entitled under Georgia law to a jury trial on the issue of St. Paul's good faith in making the payment.  <u>McLendon</u>, 167 S.E.2d at 726.

22

St. Paul may argue that it could not have acted unreasonably or other than in good faith in paying the full judgment as otherwise St. Paul would have been liable during the period of Security Life's appeal for $1,339.07 per day in additional interest on the judgment principal. (See Response to Order to Show Cause, p. 8.) Such an argument is fatuous. Even if Security's appeal took as long as nine months, less than $400,000 in possible additional interest would be at stake. On the other hand, both Security Life and St. Paul had the potential for saving as much as $2 million by a successful appeal. Moreover, St. Paul – which had received premium for the supersedeas bond exceeding $1 million – had indemnities worth over $16 million, more than double the amount of the judgment, so none of its own funds were ultimately at stake.

In essence, rather than taking the chance that it might have to come after the indemnitors for an additional $400,000 or so in interest following the appeal, according to St. Paul's legal position before this Court it intentionally forfeited as much as $2 million of its indemnitors' money but is immune from sanction therefor. Such contentions would surely raise triable issues of fact as to St. Paul's good faith and the reasonableness of its payment.

St. Paul may also assert that, pursuant to Georgia statute, it would have been liable for a 25% penalty for failing to pay its indebtedness as a surety within 60 days following the Clarks' written notice and demand for payment. This argument, too, is fallacious, as no such additional liability can be imposed under Georgia law except "upon a finding that such refusal was in bad faith." O.C.G.A § 10-7-30. Certainly St. Paul would have run little risk in failing to pay the entire judgment when both St. Paul and Security Life had a good-faith basis for contesting some $2 million thereof on appeal on the very same grounds that St. Paul had joined with Security in urging upon the trial court on remand.

In the circumstances, St. Paul's decision to consider only its own interests and disregard those of its principal and indemnitors – particularly when St. Paul's indemnity following appeal was more than twice the amount of the judgment – raises triable issues of fact, precluding summary judgment, as to the reasonableness and good faith of St. Paul's payment. Furthermore, in addition to denying summary judgment, the Court should either reinstate the stay of proceedings or dismiss this case without prejudice until the Georgia courts have definitively and finally ruled on the indemnification issues between St. Paul and Security Life.

## I. Even if This Court were to Apply New York or New Jersey Law, as Suggested by St. Paul, a Trial on the Reasonableness of the Payment of the Judgment and St. Paul's Good Faith Would Still be Required

While opting for New York or New Jersey substantive law, St. Paul nevertheless asserts that there is actually "no choice of law issue in this case because . . . the relevant case law is virtually uniform from jurisdiction to jurisdiction." (Response to Order to Show Cause, p. 10 n. 2.) Once again St. Paul's assertion is erroneous. Nevertheless, New York law is similar to that of Georgia as expressed in M-Pax, McLendon, and the February 10, 2003 order of the Court of Appeals. In New York, so long as "a triable issue" is raised, the surety that pays a judgment is required to show not only its good faith but also the reasonableness of the amount of the payment. International Fidelity Ins. Co. v. Spadafina, 192 A.D.2d 637, 596 N.Y.S.2d 453, 455 (2d Dep't 1993), and cases therein cited, 596 N.Y.S.2d at 454.[3]

Spadafina was cited with approval in General Ins. Co. of America v. Merritt-Meridian Construction Corp., 1997 WL 187372, at *3 (S.D.N.Y., April 16, 1997), where Judge Chin found that "the principal issue before this Court is whether defendants have submitted sufficient evidence from which a jury could conclude that General failed to act reasonably and in good

---

[3] St. Paul must know this is the law as St. Paul has also cited Spadafina. (Response to Order to Show Cause, p. 10.)

faith . . . in making payments on the Evergreen judgment and the other surety bonds." The court denied summary judgment on the ground that "General's actions after the judgment raise a number of questions of material fact as to whether General breached its duty of good faith," one of the questions being "whether it would have been more reasonable for General to have used the $975,209.89 that it paid to Evergreen to obtain a supersedeas bond instead of paying the judgment," another being "whether General breached its duty by waiting only 14 days before making payment to Evergreen and even before the time to appeal had expired," and still another being "whether General should have sought to negotiate a settlement with Evergreen rather than simply pay the judgment in full." The court further noted that "now that the judgment has been reversed in part, General has *overpaid* Evergreen, at least for now" (italics in original), and held: "Because all of these are fair issues for trial, summary judgment is denied." Id. Later in the opinion, the court observed that, "[u]nder New York law, a 'party that pays a claim it is not obligated to pay is a volunteer and may not recover those expenses'" Id. at *4.

The court's quote is taken from General Ins. Co. of America v. K. Capolino Construction Corp., 903 F. Supp. 623, 626 (S.D.N.Y. 1995), where Judge Conner cited National Union Fire Ins. Co. v. Ranger Ins. Co., 190 A.D.2d 395, 599 N.Y.S.2d 347, 348 (4th Dep't 1993), and other New York cases. In K. Capolino, the defendant argued that General was not entitled to summary judgment because it breached the obligation "to act in good faith when deciding whether to pay, settle or defend a claim made by an obligee under a bond." Id. at 628. General conceded that under New York law it could not be granted summary judgment if an issue of fact existed as to its good faith, and the court cited National Surety Co. v. Fulton, 192 A.D. 645, 183 N.Y.S. 237, 239 (1st Dep't 1920), for the proposition that a "surety's good faith in agreeing to make payment under [a] bond is [a] question for [the] jury despite 'abundant evidence' of good faith." Id. The

court therefore held that, under New York law, "[t]o defeat summary judgment, all Capolino must demonstrate is the existence of an issue of fact regarding General's good faith. . . . Drawing all justifiable inferences in Capolino's favor, we cannot say, as a matter of law, that General was acting in good faith." Id.

New Jersey law is similar to that of New York and Georgia. Thus in Chemical Bank of New Jersey National Association v. Bailey, 296 N.J. Super. 515, 687 A.2d 316, 320-21 (A.D. 1997), the court held that, to receive indemnification for settlement payments, the indemnitee must demonstrate not only that "the indemnitee faced potential liability for the claims underlying the settlement" but also that "the settlement amount was reasonable." Id. at 321. In International Fidelity Ins. Co. v. Jones, 294 N.J. Super. 1, 682 A.2d 263, 265 (A.D. 1996), the Appellate Division spoke even more forcefully, rejecting the "argument that as long as the expenditure . . . was made in good faith, its reasonableness cannot be placed in issue in an action to compel reimbursement" and declining to "interpret the indemnity agreement to compel that result as such a conclusion is disfavored."

In Jones the court further opined "that our courts should reject the view that under an indemnity agreement the obligor has no defense and that even truly unreasonable payments must be reimbursed as long as they are made in good faith." Id. Citing Perkins v. Thompson, 551 So. 2d 204 (Miss. 1989), the New Jersey court added that "[f]ailure to oversee the reasonableness of such awards could result in inequities if not promote corruption." Jones, 682 A.2d at 265. Thus, even where good faith in making the payment is shown, the duty to indemnify will not be enforced to the extent that the amount of the payment was unreasonable.

In short, even were New York or New Jersey substantive law to be applied to the indemnification agreements before this Court as urged by St. Paul, the result would be similar to

that required by the February 10, 2003 order of the Court of Appeals and M-Pax and McLendon

under Georgia law.  Either the obligations of the indemnitors to the surety would automatically

be reduced by the amount by which the judgment was reduced on appeal or, at the very least,

summary judgment would have to be denied and a jury trial ordered on the reasonableness of the

payment made by St. Paul to the Clarks, and St. Paul's good faith in making such a payment,

during the pendency of a further appeal raising grounds for reduction of the judgment that St.

Paul as well as Security Life had urged before the trial court on remand.  See also Palevac v. Mid

Century Non Auto, 101 Nev. 835, 710 P.2d 1389, 1391 (1985), where the court denied summary

judgment and ordered a trial as to whether the payments made "under the Surety Bond were

nonobligatory or voluntary."

As Judge Chin held in Merritt-Meridian, 1997 WL 187372, at *3, there are "fair issues

for trial" precluding summary judgment where "the judgment has been reversed in part" and thus

the surety "has *overpaid*."  In the circumstances, this Court should deny summary judgment, stay

or dismiss this case, and await the final outcome of the Georgia appellate proceedings.

## J. The Cases from Other Jurisdictions Relied on by St. Paul are Distinguishable from the Matter Before This Court, as are the Indemnification Agreements at Issue in Those Cases

As has been demonstrated, St. Paul is wrong in asserting that the law of all jurisdictions

as  to the construction and enforcement of indemnification agreements is substantially the same.

The substantive law of Georgia applies to this case, and that law either mandates the reduction of

the indemnification obligations to the extent the judgment is reduced on appeal or, at the least,

requires a jury trial to determine whether St. Paul's payment to the Clarks was reasonable and

made in good faith.  Similarly, New York and New Jersey law would likewise require a trial on

the reasonableness and good faith of the payment.  Cases from other jurisdictions, and applying

other laws, are therefore irrelevant to the determination of this motion.  Nevertheless, all of the

decisions cited by St. Paul in favor of summary judgment are distinguishable from the matter

before this Court, including the two cases it cites from New York and one from New Jersey, and

indeed almost all of the indemnity agreements at issue in St. Paul's cases are far broader than

those before this Court.

      In Spadafina, 596 N.Y.S.2d at 454, cited by St. Paul at p. 10 of its Response to Order to

Show Cause, the reason why, "in enforcing [the] surety's contractual right to indemnity, it was

'irrelevant' whether [the] principal was liable on [the] underlying debt," was that the

indemnification agreement explicitly provided that the surety

> had the authority to: "charge [Spadafina] for any and all
> disbursements made by it in good faith in and about matters herein
> contemplated by this Agreement under the belief that it is or was
> liable for the sums and amounts so disbursed, or that it was
> necessary or expedient to make such disbursements, whether or not
> such liability, necessity or expediency existed. . . ."

Only for that reason was it "irrelevant whether Spadafina was actually liable on the underlying

debt to Kelly. . . ."  Spadafina, 596 N.Y.S.2d at 454.

      The language of the indemnification agreements at issue in the case at bar – all prepared

especially for this specific matter by the sophisticated surety bonding department at St. Paul – is

in no way similar to that quoted above.  Rather, the agreements drafted by St. Paul (Exh. 16,

collectively) have only the following indemnification provisions:

> we severally and not one with the other agree to indemnify you and
> hold you harmless in respect of our respective proportions of any
> and all loss, damages, claims, costs, expenses and attorney's fees
> which you may incur by reason of you having furnished the
> aforesaid bond and we further agree that we shall immediately pay
> you, upon your demand, the amount of any claim that you may
> receive under and by reason of your having issued the aforesaid
> bond.

Nothing in the indemnification agreements before this Court authorizes St. Paul to make payments that it is not required to make or where no liability, necessity, or expediency exists, even if it makes those payments in good faith and under the belief that it is liable for the sums disbursed or that it was necessary or expedient to make such payments.

Even the form indemnity agreements provided by St. Paul and signed by Security Life and SAFE (Exh. 15) contain no language such as that in Spadafina or most of the other cases cited by St. Paul.  Security Life is obligated by its agreement

> to indemnify and keep indemnified the Company and hold and save it harmless from and against any and all loss or expense of whatever nature which the Company shall or may for any cause, at any time, sustain for or by reason or in consequence of the Company having executed said bond or undertaking.

SAFE is required by its special indemnity agreement to "jointly and severally join in the foregoing indemnity agreement" executed by Security Life.

Thus no provision of the indemnification agreements at issue before this Court makes the indemnitors liable to St. Paul for payments not actually required but erroneously or otherwise

> made in good faith . . . under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed.

Accordingly, Spadafina is not on point except, of course, insofar as it holds that under New York law the surety must demonstrate "bona fides" and "reasonableness as to the amount paid" when "a triable issue" is raised.  Id. at 454-55.

In General Accident Ins. Co. of America v. Merritt-Meridian Construction Corp., 975 F. Supp. 511 (S.D.N.Y. 1997) (cited at Response to Order to Show Cause, p. 18), the indemnity agreement was virtually identical to that in Spadafina.  975 F. Supp. at 514. In Andre Construction Associates, Inc. v. Catel, Inc., 293 N.J. Super. 452, 681 A.2d 121 (Super. 1996)

(Summary Judgment Brief, p. 15), the indemnification agreement likewise required indemnity for payments made by the surety regardless of its actual liability. Accordingly, neither of these cases is on point to the case at bar.

St. Paul cites Bristol Steel & Iron Works, 722 F.2d at 1163 (Response to Order to Show Cause, p. 12), where the Fourth Circuit held that when there is an express indemnity agreement, the surety is entitled to indemnity according to "the letter of the contract." But in that case as well, the indemnity agreement explicitly provided that the surety had the right to reimbursement for a payment made in good faith under the belief it was necessary even if it actually was not. Again, there is no such provision in the indemnification agreements at issue in the case at bar. Thus, according to "the letter of the contract" (id.), St. Paul has no contractual right to indemnification for payments erroneously or otherwise wrongly made. An additional pressing circumstance in Bristol Steel, somewhat similar to those presented by the two cases next cited below, was that the Pennsylvania Department of Transportation had disqualified the surety from acting on any performance bonds until it made payment. Id. at 1164. No comparable exigencies are present in the case at bar.

At p. 13 n. 4 of its Response to the Order to Show Cause, St. Paul cites United States Fidelity & Guaranty Co. v. Sandoval, 223 U.S. 227, 32 S. Ct. 298, 56 L. Ed. 415 (1912). In that case, however, unlike the circumstances at bar, the judgment had been finally affirmed by the Supreme Court of the Territory of Arizona, so there was little or no further possibility of a reduction of the amount of the judgment. Moreover, although no execution had yet been issued, the territorial governor threatened to revoke the surety's license to transact business in Arizona if the judgment remained unpaid pending a possible appeal to the United States Supreme Court.

Accordingly, unlike the circumstances at bar, the surety could not reasonably be expected to resort to the courts to avoid or delay payment.

St. Paul cites <u>Commercial Ins. Co. of Newark, New Jersey v. Pacific-Peru Construction Corp.</u>, 558 F.2d 948 (9th Cir. 1977) (Response to Order to Show Cause, p. 13), decided under the law of Hawaii. There, too, "[t]he sum was made certain by a Peruvian judgment" upheld by the Supreme Court of Peru but remained unpaid. <u>Id.</u> at 954-55. With lawlessness similar to that in <u>Sandoval,</u> a Peruvian trial judge then ordered the surety to perform on its bond promptly or risk double liability. Again, unlike the circumstances at bar, the surety could not reasonably resort to the courts to avoid or delay payment.

St. Paul cites <u>Old Republic Surety Co. v. Reliable Housing, Inc.</u>, 572 S.E.2d 442, 2002 WL 31687287 (N.C. App., Dec. 3, 2002) (Response to Order to Show Cause, p. 15). It is unclear from the text of this unpublished opinion whether or not the surety had the right under the terms of the indemnification agreement to make payments for which its principal was not in fact liable so long as the payments were made in good faith. But the court refers to the Fourth Circuit's decision in <u>Bristol Steel,</u> 722 F.2d at 1163, for the proposition that "similar contracts" – with "[s]trict indemnity provisions, such as the one in the instant case" – "have been upheld" by other state and federal courts. <u>Old Republic</u> at **2. The "strict . . . [p]rovisions" quoted in <u>Bristol Steel</u> at 1163 give the sureties "the right to reimbursement by the Contractor for any payment made by them in good faith 'under the belief . . . that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed.'" It therefore seems likely, albeit it is uncertain, that the indemnification agreement in <u>Old Republic</u> included similar language not set forth in that opinion. In any event, the case was decided under North Carolina law, and it is apparent that that state, unlike Georgia, New York and New Jersey,

does not permit a dispute as to whether "the claims were properly paid to the claimants." Id. at **2.

St. Paul cites American States Ins. Co. v. Glover, 960 F.2d 149, 1992 WL 78786 (6th Cir., April 16, 1992) (Response to Order to Show Cause, p. 16); but in that case, too, the indemnity agreement contained a provision specifically requiring indemnity for payments made by the surety regardless of whether liability actually existed. There is no such provision in the indemnity agreements before this Court.

St. Paul cites Fireman's Fund Ins. Co. v. Nizdil, 709 F. Supp. 975 (D. Or. 1989) (Response to Order to Show Cause, p. 17). The court in Nizdil states that "[t]he defendant refused to provide plaintiffs with any collateral security to protect or indemnify them from any loss on their bonds. As a result, plaintiffs were free under the terms of their indemnity agreements with defendant to settle any claims in good faith." Id. at 977. (Emphasis added.) Although it is not entirely clear in the absence from the opinion of the actual texts of the indemnification agreements, it would appear from the underscored portion of the above quotation that, unlike the indemnification agreements before this Court, the agreements in Nidzil did require indemnity for claims settled in good faith.

St. Paul cites United States Fidelity & Guaranty Co. v. Feibus, 15 F. Supp. 2d 579 (M.D. Pa. 1998) (Response to Order to Show Cause, p. 18). In that case, however, the indemnity agreement authorized the surety to pay where it "might be liable" or the payments were necessary in order to "avoid or lessen its alleged liability." Id. at 583. The court therefore held that the surety could recover under the indemnity agreement, as the applicable "language does not require that payments be made only in the face of actual liability under the bonds." Id. There is no such provision in the indemnification agreements before this Court.

At p. 18 of its Response to Order to Show Cause, St. Paul cites <u>Frontier Ins. Co. v.</u> <u>International, Inc.</u>, 124 F. Supp. 2d 1211, 1212 (N.D. Ala. 2000). In that case, again, the indemnification agreement had language requiring indemnity for payments made by the surety in its discretion regardless of actual liability.

St. Paul cites <u>Employers Ins. of Wausau v. Able Green, Inc.</u>, 749 F. Supp. 1100, 1103 (S.D. Fla. 1990) (Response to Order to Show Cause, p. 19), where language in the indemnification agreement requires indemnity for payments made by the surety regardless of actual liability.

Finally, St. Paul cites two more cases, not yet discussed herein, in its summary judgment brief. <u>Western Surety Co. v. Medsolutions, Inc.</u>, 2003 WL 251433, at *1 (N.D. Tex., Feb. 3, 2003), cited at p. 14, is yet another case in which the terms of the indemnification agreement require indemnity for payments made by the surety in its discretion regardless of actual liability. <u>Hanover Ins. Co. v. Smith</u>, 182 Ill. App. 3d 793, 538 N.E.2d 710 (1989), cited at p. 15, is similar. Thus, these indemnification agreements in no way resemble those before this Court.

It is evident from the foregoing analysis that the great majority of the cases cited by St. Paul in support of its arguments for summary judgment are irrelevant to the current dispute not only because they were decided under the laws of other states but also because the indemnification agreements at issue in those cases were far broader than those before this Court and by their terms required reimbursement by the indemnitors for payments made in good faith even where there was in fact no liability. In two other cases cited by St. Paul, it is uncertain from the text of the opinions, but appears most likely, that the indemnification language was similarly broad. Moreover, with the exception of the two New York cases and the one New Jersey case cited by St. Paul, all of which also contain broad indemnification provisions, none of the states

whose decisions are cited by St. Paul permits the indemnitors to raise an issue of fact as to the reasonableness of the payment.

Additionally, two of the cases St. Paul cites depend on highly unusual circumstances in no way similar to those before this Court. In one matter, a Peruvian trial judge ordered the surety to pay promptly or its liability would be doubled. In the other matter, the governor of the Territory of Arizona ordered the surety to pay or it would no longer be permitted to write bonds in the territory. These acts, characterized by the appellate courts in the subsequent proceedings against the indemnitors as essentially lawless, were not capable of prompt correction by further direct appeal. In both cases, however, unlike the case at bar, final appeals had already been decided by the highest court of the nation (Peru) or territory (Arizona) and the amounts of the judgments were fixed.

Here, to the contrary, Security Life's appeal is pending, the final amount of the judgment has not been determined, and St. Paul could have joined in the appeal rather than paying the disputed judgment. In these circumstances, Georgia law either mandates that the indemnitors' liabilities to St. Paul be reduced if the judgment is reduced on appeal or requires a jury trial on the reasonableness and good faith of St. Paul's payment.

### K. The Indemnification Agreements Before This Court are Not Ambiguous; but Whether They are or Not, They do Not have the Meaning That St. Paul Ascribes to Them

The so-called "leading case" from the Fourth Circuit cited by St. Paul for the proposition that the indemnification agreements must be read in St. Paul's favor as a matter of law (Opposition to Stay, p. 10), Bristol Steel & Iron Works, holds, 722 F.2d at 1163, that where there is an "'express indemnification contract' . . . the rights of the Sureties are not to be determined by general 'indemnity principles' . . . but by the 'letter of [the Contractor's] contract' of

indemnification."  In <u>Bristol Steel</u> the indemnity agreement gave the sureties "the right to reimbursement by the Contractor for any payment made by them in good faith 'under the belief . . . that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed.'"  <u>Id.</u>

No similar contractual terms appear in the indemnification agreements, specially drafted by St. Paul, that are before this Court.  Thus, nothing in defendants' agreements herein (Exh. 16, collectively) provides a right of reimbursement to St. Paul for a payment made in good faith under the belief that it was necessary or expedient to make such disbursement when such liability, necessity or expediency did not in fact exist.

Accordingly, St. Paul is not entitled under "the letter" of these indemnity agreements to be reimbursed for its premature payment of the entire judgment over Security Life's protest and during its appeal on grounds that St. Paul as well had previously urged upon the trial court. Instead, St. Paul must abide the final resolution of the Georgia appeals that will once and for all determine the amount properly owed under the judgment.

**L.  Issues Exist as to the Intended Operation of the Various Indemnification Agreements – Which Provide for a Total of 285% in Indemnity – and the Order in Which They Apply**

The defendants maintain that the indemnification agreements are clear on their face and must be read in the guarantors' favor as a matter of law so as to require St. Paul to await the fixing of the final amount of the judgment upon the conclusive disposition of the Georgia appeal and collect only that sum from Security Life or SAFE or, failing that, the other indemnitors. Certainly, in the absence of the broad provisions found in such cases as <u>Bristol Steel</u> and <u>Spadafina</u>, these agreements cannot be read unambiguously in St. Paul's favor.

If this Court has any doubt, however, concerning the appropriate construction of these indemnification agreements, then under Georgia law, in "look[ing] to the four corners of the agreement[s] to ascertain [their] meaning," the Court may consider "[t]he intent of the parties . . . as the cardinal rule of construction," and may also "consider the background of the contract and the circumstances under which it was entered into." Brogden v. Pro Futures Bridge Capital Fund, L.P., – Ga. App. –, – S.E.2d –, 2003 WL 1480754, at *2 (March 25, 2003).

See also Schaffer v. City of Marietta, 220 Ga. App. 382, 469 S.E.2d 479, 481 (1996) ("Where the terms of a contract are susceptible of more than one meaning, the fundamental rule of contract construction is to give them the meaning which will best carry out the intent of the parties. . . . In doing this we must look at the instrument as a whole and consider it in light of all the surrounding circumstances."); Associated Mechanical Contractors, Inc. v. Martin K. Eby Construction Co., Inc., 964 F. Supp. 1576, 1581 (M.D. Ga. 1997) ("In determining the proper resolution of the ambiguous contract provisions, the cardinal rule for a court is to ascertain the intention of the parties. . . . The meaning of ambiguous terms may be resolved by reference to the conduct of the parties which evidence such intent.") It goes without saying that if, even after such consideration, the Court still cannot be certain of the meaning of the indemnity provisions, then issues of fact will remain.

In any event, issues exist as to how the various contemporaneously made indemnification agreements, amounting to 285% of the whole, were intended to operate inter sese and in what order. "'[I]n cases of contemporaneous agreements *between the same parties with relation to the same subject matter*, each writing may be used to ascertain the true intention of the parties and may authorize a determination that, when construed together, they constitute, as a whole, but one contract.'" Brogden, 2003 WL 1480754, at *2.   (Italics in original.)   Here, because the various

contemporaneously made agreements were not all between the same parties, "it does not appear that we can construe the . . . agreements as one." Id. But it does appear from Brodgen that all of the agreements may nevertheless be read together in an effort "to ascertain the intent of [the] parties." Id.

Defendants in this action maintain that under the entire indemnification arrangement as envisioned by the parties and committed to writing, it was clear to all participants that St. Paul would not come after the guarantors for indemnity until it had first exhausted all reasonable efforts to collect from the principal, Security Life, and its holding company, SAFE. Here, a judgment had been entered against Security Life for $14,476,694.18 (Amended Complaint, ¶ 22) and Security required an appeal bond in the amount of $16,220,000. (Amended Complaint, ¶25.) Security advised the defendants and other reinsurers that, because the amount of the judgment exceeded Security's excess, it would be unable to procure the bond unless the reinsurers were willing to act as indemnitors with respect thereto. Because it had not yet been determined by arbitration between the reinsurers and Security whether any portion of the judgment was subject to reinsurance coverage, the reinsurers agreed to act as indemnitors as requested. (See Exh. 18, infra.)

St. Paul required indemnification agreements that added up to 285% of the face amount of the bond. In November of 1996, Security Life, as principal, provided an indemnity agreement acknowledging its liability for 100% of the total indemnity on the bond. (Exh. 15.) At the same time, Security's holding company, SAFE, provided a special indemnity agreement acknowledging that it was severally liable with Security for 100% of the indemnity. (Exh. 15.) During the same time frame, each of the reinsurers separately provided indemnification agreements in differing percentages – ranging from .4250% to 22.6312% – that equaled 85% of

the total indemnity.[4]  (Exh. 16, collectively.)   Security Life also provided a letter of credit in the amount of  $2,433,000, which was 15% of the amount of the bond.    (St. Paul's Summary Judgment Brief, pp. 2-3.)

On November 26, 1996 this law firm sent a letter to counsel for Security Life memorializing the agreement between the reinsurers and Security with respect to the posting of the appeal bond.  (Exh. 18.)  According to paragraph 4 of the November 26 letter, part of the consideration for the reinsurers' agreement to act as indemnitors was "that Security Life shall indemnify and hold harmless the Reinsurers against all amounts paid by them to the surety or expenses incurred, by reason of, or in relation to, their said indemnity, in the event and to the extent that it shall be determined, pursuant to paragraph 8 herein that said payments or expenses in the Clark matter are not subject to reinsurance coverage. . . ."  Thereafter, it was determined by arbitration between the reinsurers and Security Life that no part of the Clark judgment was covered by reinsurance.  (Exh. 19.)

A series of contemporaneously made agreements providing for 285% in total indemnification but making Security Life, as principal, and SAFE each liable for 100% demonstrates that St. Paul would first attempt to collect its indemnity from Security and SAFE. Furthermore, recent events have further shown that it was St. Paul's intention not to look to Security Life for only 15% of the indemnity and to the reinsurers for the remaining 85% but, rather, to hold Security Life and SAFE primarily liable for the entire amount.  The letter of credit from Security Life in the amount of $2,433,000.00 represented 15% of the maximum amount of the bond for the original judgment; but the judgment on remand paid by St. Paul during Security Life's current appeal totaled only $7,527,513.91.  Thus, the letter of credit in place then

---

[4] As indicated at p. 7 of St. Paul's Summary Judgment Brief, the defendants at bar provided indemnification agreements totaling 81.6%.  Allianz,  not a party to this case, provided an additional 3.4%, for a total of 85%.

amounted to some 32% of the judgment. As admitted by St. Paul, it has now drawn down on the entire letter of credit. (St. Paul's Summary Judgment Brief, p. 7.)

The import of St. Paul's action is clear. If St. Paul had actually understood its arrangements with the guarantors to mean that they were primarily liable for reimbursement of all but 15% of the judgment, it stands to reason that the surety would have drawn down on only that part of Security's letter of credit amounting to that 15% and would have sought the other 85% from the reinsurers. Instead, St. Paul drew down on the entire letter of credit that was equal to almost one-third of the judgment paid, and prematurely sought the rest from the reinsurers rather than Security Life or SAFE.

St. Paul's actions, while perhaps financially beneficial to the defendants herein, nevertheless indicate that St. Paul, like the defendants, understood the various November 1996 agreements between the parties to contemplate that St. Paul was obligated to make its best efforts to collect from Security Life and SAFE before looking to the reinsurers; and St. Paul ought to be required to continue to do so. This was obviously what St. Paul had in mind when it required that Security and SAFE provide 100% indemnity. At the least, the intended operation of the various indemnification agreements and the order in which they were to apply raises issues of fact that defendants ought to be able to explore in discovery.

## CONCLUSION

For all of the reasons stated herein, this Court should apply the substantive law of Georgia and deny St. Paul's motion for summary judgment. Additionally, the Court should

either reinstate its stay or dismiss this action without prejudice until the Georgia proceedings between St. Paul and Security Life have been resolved.[5]

Respectfully submitted,

_____

J. Snowden Stanley, Jr., Fed. Bar #00059
SEMMES, BOWEN & SEMMES, P.C.
250 West Pratt Street
Baltimore, MD 21201
(410) 539-5040
        -and-
MOUND COTTON WOLLAN & GREENGRASS
Lawrence S. Greengrass
Daniel Markewich
One Battery Park Plaza
New York, NY 10004
(212) 804-4200

**ATTORNEYS FOR DEFENDANTS**
AMERICAN UNITED LIFE INSURANCE
COMPANY, FIRST ALLMERICA FINANCIAL
LIFE INSURANCE COMPANY, CONNECTICUT
GENERAL LIFE INSURANCE COMPANY,
COMBINED INSURANCE COMPANY OF
AMERICA, CROWN LIFE INSURANCE
COMPANY, THE EQUITABLE LIFE
ASSURANCE SOCIETY OF THE UNITED
STATES, MANUFACTURERS
LIFE INSURANCE COMPANY, PHOENIX
LIFE INSURANCE COMPANY, SUN LIFE
ASSURANCE COMPANY OF CANADA,
SWISS RE LIFE & HEALTH AMERICA,
INC., SWISS RE AMERICA HOLDING
CORPORATION, UNUM LIFE INSURANCE
COMPANY OF AMERICA, GENERAL &
COLOGNE LIFE RE OF AMERICA, and
CANADA LIFE INSURANCE COMPANY OF
AMERICA

_____

[5] In the alternative, defendants join in Transamerica's motion for dismissal of St. Paul's Amended Complaint for failure to state a claim, and adopt and incorporate by reference the grounds and arguments set forth in Transamerica's papers.